1
2
3
4
5
6
7
8

9                    **UNITED STATES DISTRICT COURT**

10                   **CENTRAL DISTRICT OF CALIFORNIA**

11

12   CARD TECH INTERNATIONAL,
     LLLP, a Maine Limited Liability          Case No.  CV 11-2434 DSF (PLAx)
13   Limited Partnership,
                                              **FINDINGS OF FACT AND**
14        Plaintiff,                          **CONCLUSIONS OF  LAW**

15        v.

16   SHARYN PROVENZANO a.k.a.
     SHARYN PROVENZANO, an
17   individual, and PRODEEN, INC.

18        Defendants.

19

20        A trial by the Court was held January 10-13, 2012.

21        The Court ordered that counsel for Card Tech International LLLP (Card

22   Tech) submit Card Tech's proposed Findings of Fact and Conclusions of Law to

23   counsel for Defendants Sharyn Nappi a.k.a. Sharyn Provenzano and Prodeen, Inc.

24   (referred to jointly and severally as Provenzano except as otherwise indicated).

25   Apparently because of defense counsel's trial schedule, he was unable to provide

26   timely comments.  Card Tech lodged its [Proposed] Findings of Fact and

27   Conclusions of Law on February 23, 2012.  On February 27, 2012, Provenzano

28   lodged Defendants and Counterclaimants' [Proposed] Findings of Fact and

1   Conclusions of Law  On March 12, 2012, Provenzano lodged her Opposition to
2   Card Tech's Proposed Findings of Fact and Conclusions of Law, and Card Tech
3   lodged its Objections to Defendants' [Proposed] Findings of Fact and Conclusions
4   of Law.  Although the Court has reviewed and considered all of these documents,
5   and has made some additions, deletions, and changes based on its detailed review of
6   the transcript and the documentary evidence and its own recollection of the trial and
7   assessment of the credibility of the witnesses, where Provenzano has not objected to
8   paragraphs of Card Tech's [Proposed] Findings of Fact and Conclusions of Law,
9   the Court generally accepts those findings as accurate, and has not sought or cited
10  to further support in the record.  The Court has included proposed Findings of Fact
11  and Conclusions of Law proposed by Provenzano, to the extent relevant and not
12  contradicted by the evidence.  The deletion of a proposed finding or conclusion
13  does not necessarily mean that the Court disagrees with the proposed finding or
14  conclusion.  The Court may simply have determined that the finding was not
15  necessary to its determination.

16                    **<u>FINDINGS OF FACT</u>**

17      1.      This Court has subject matter jurisdiction pursuant to the Trademark
18  Act of 1946, as amended (the Lanham Act), 15 U.S.C. § 1125(a) and § 1125(d).
19  Also, the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332: the matter
20  in controversy exceeds the sum or value of $75,000, exclusive of interest and costs
21  and there is complete diversity of citizenship between the parties.  The Court has
22  supplemental jurisdiction over the state-law claims.  28 U.S.C. § 1367.

23      2.      Venue is proper in this district as the defendants reside here.

24      3.      Card Tech is a Maine limited liability limited partnership, with its
25  principal place of business in Maine.

26      4.      At the time of trial, the employees of Card Tech were Norman Farrar,
27  his son Stephen Farrar, and one other person.  Norman Farrar is a principal of Card
28  Tech.

5.     Provenzano is an individual residing in Acton, California.

6.     Prodeen, Inc. is a California corporation with its principal place of business in California.  Provenzano directs the conduct of Prodeen.  From 2003 through 2010 there were no other employees of Prodeen.  Tr. 1/12/12 at p. 162:11-18.  There is no evidence of any other employees of Prodeen since 2010.

7.     Card Tech is, and since March 2010 has been, in the business of selling technical cleaning products.  Technical cleaning products are used to clean the slots of credit card machines, bill readers, slot machines, key cards, and similar magnetic card readers.  It is a niche business.  Individual technical cleaning products are very inexpensive.  Tr. 1/12/12 at p. 161:8-9.

8.     In the late 1990s Norman Farrar was a principal of a company named Enefco, which decided to go into the card cleaning products business.  Farrar met Provenzano at a trade show and eventually hired her as Enefco's first sales manager for the card cleaning business.  Provenzano worked from her home in Acton, California, and was in charge of sales and market development.  Farrar worked well with Provenzano and thought she was talented.

9.     In or around 2003, Farrar sold his company.  The new owners "released" Provenzano -- she was terminated.  Tr. 1/10/12 at p. 42:24-25, Tr. 1/11/12 at pp. 179:22-180:1.

10.     In 2003 Provenzano began marketing and selling technical cleaning products.  In or around March 2006, Provenzano established Prodeen, Inc. dba Proven Products, which sold cleaning cards.  Tr. 1/11/12 at pp. 180:14-181:6.  Provenzano owns all of the stock of Prodeen, Exhibit 75, and directs the conduct of Prodeen.

11.     As of the beginning of 2010, Provenzano marketed and sold technical cleaning products under the trademarks and trade dress PROVEN PRODUCTS, a stylized V symbol, PRESAT with a water droplet symbol, PRESAT with a rippled water image, DIAMOND TECHNOLOGY, a "magnifying glass and dollar bill"

1   image, an orange area on the left side and images of certain machines in certain

2   layouts, CLEAN SWAB, EASY WIPES, EASY CLEAN CARD, and EASY

3   SWAB, and the slogan "The Results Are Obvious";  and utilized a website.  Tr.

4   1/10/12 at pp. 64:15-70:10; Tr. 1/11/12 at pp. 181:12-22, 183:1-185:6, Exhibit 26.

5   On June 10, 2008, trademark registration number 3443482 was issued to

6   Provenzano for the mark PRESAT.  See Exhibit 93-2.

7           12.    There is nothing about the layout or overall appearance of the trade

8   dress, both packaging and website, that enables the package or website,

9   respectively, to function.  The "V"-shaped Proven Products logo, and the Diamond

10  Technology logo with its three overlapping diamonds, are wholly nonfunctional;

11  the water drop design and the rippled water designs, the magnifying glass and

12  dollar bill images, and the slogan, are wholly non-functional for cleaning cards.

13  The content of the website can be arranged differently; the package can have a

14  different appearance.  Neither the appearance of the packaging nor the website

15  provides a benefit apart from identifying the source of the product.  Neither the

16  layout of the website nor the layout or color of the packaging describes the

17  products.  The particular arrangement of the depictions and instructions, and the

18  overall visual impression created by Card Tech's website and packaging, is not

19  essential to use of the products Card Tech sells.  Moreover, there are numerous

20  ways to design a website or product packaging for cleaning card products.  See

21  Exhibit 26.  Therefore, protecting Card Tech's trade dress will not impair

22  competition in the industry.

23          The Asset Purchase Agreement

24          13.    In 2006 Farrar reconnected with and provided some assistance to

25  Provenzano.  He was impressed with the package design she used.  At about the

26  time that Farrar's "non-compete" agreement with Enefco was about to end, Farrar

27  and Provenzano began negotiating for Card Tech's purchase of Provenzano's

28  business.  Card Tech was established to purchase the assets of Proven Products

1  from Prodeen.  TR. 1/10/12 at p. 46:5-19.  Prior to entering into the Asset Purchase

2  Agreement, Farrar wanted Provenzano to be sure she would be happy in her new

3  role.  Tr. 1/10/12 at pp. 44:8 -56:15; <u>see</u> Exhibit 21.

4      14.   On March 8, 2010, Provenzano and Card Tech entered into an Asset

5  Purchase Agreement.  Exhibit 75.  The signatories for the seller are Prodeen, Inc.

6  and Provenzano.  Pursuant to that Agreement, Provenzano sold to Card Tech and

7  Card Tech bought from Provenzano the business assets including, among other

8  things:

9      •   All inventory;

10     •   All right, title and interest in and to all of the trademarks, trade names,

11  dbas and assumed names used to any extent in the operation of the business or

12  otherwise related thereto;

13     •   All business records, including but not limited to all customer and

14  supplier lists;

15     •   The internet websites:  www.4cleaningcard.com and www.presat.com,

16  including the content and all rights necessary to access, operate and use those

17  websites, and the domain names related to the business;

18     •   All goodwill of the business.

19  Exhibit 75 at 1.1.  Card Tech understood it was purchasing all trademarks, trade

20  names, business records, customers, promotional material, and goodwill.  Tr.

21  1/10/12 at pp. 62:23-70:21.  Provenzano understood she was selling to Card Tech

22  all of the trademarks, trade names, and dbas, assumed names, the art work for the

23  packaging and all business records.  Tr. 1/12/12 at pp. 3:24-4:4, 5:13-17, 6:22-24.

24  Provenzano executed a separate written assignment of the PRESAT trademark.

25  Exhibit 93.

26     15.   In the Agreement, Provenzano represented that there were no

27  undisclosed liabilities, and that she had disclosed to Card Tech all material facts.

28  Exhibit 75 at 8.11, 8.17.

16.     Acquiring all of Provenzano's intellectual property was important to Card Tech.  Card Tech considered the name, the packaging and the website important to have.  Tr. 1/10/12 at pp. 51:7-21, 57:20-58:14.

17.     Provenzano's packaging was attractive and desirable to Card Tech. No other competitors were using a design similar to the Provenzano packaging that Card Tech purchased.  Tr. 1/10/12 at p. 68:23-25.  It was important to Card Tech to go into the market with a known product and trade name.  Tr. 1/10/12 at pp. 51:15-18, 58:1-4.

18.     The purchase price to be paid by Card Tech to Provenzano is $253,315.36, payable $205,795.36 at closing and $47,520.00 paid over two years. Card Tech paid $205,795.36 at closing and executed a promissory note for $47,520.00.  It appears that the $205,795.36 was for the inventory, and the $47,520.00 was for the goodwill and all of the other assets.  Tr. 1/10/12 at p. 73:21-23; 1/12/12 at p. 14:14-23.  The Agreement itself states that there was an allocation of the purchase price set forth in Schedule 7, Exhibit 75 at **7**, but no schedules were provided to the Court.  Card Tech has paid $23,760.00 on the promissory note.  The last payment Card Tech made on the promissory note was the February 2011 payment.  Tr. 1/11/12 at p. 107:15-17.  The amount unpaid on the note is $23,760.00.

19.     Card Tech contends that Provenzano did not disclose a liability that she was obligated to disclose by the terms of the Asset Purchase Agreement, in the amount of about $6,000.  Card Tech contends it paid that liability at Provenzano's request and was not able to offset this liability completely.  Tr. 1/11/12 at p. 135:3-25.  Provenzano's objection that she was not required to disclose the liability because Card Tech was not assuming liabilities is legally incorrect.  The Asset Purchase Agreement contained a specific warranty that all liabilities had been disclosed.  Provenzano breached this warranty by her failure to disclose.  Moreover, that Card Tech paid the amount is undisputed.  Nevertheless, this breach does not

1    appear to have been material to Card Tech.

2        20.    The Asset Purchase Agreement, Employment Agreement, and

3    promissory note were executed in connection with one another.  <u>See</u> Exhibits 75,

4    76, and 77.

5            The Employment Agreement

6        21.    Both Card Tech and Provenzano wanted Provenzano to have a five

7    year employment contract.  Tr. 1/11/12 at p. 15:22-23.  Provenzano, at the age of

8    62, wanted job security through an agreement that could be terminated only for just

9    cause.  Tr. 1/12/12 at p.168:4-11.  Card Tech felt Provenzano would be a very

10   important part of the company and wanted her services.  Tr. 1/10/12 at pp. 52:11-

11   14, 125:15-17.  During the negotiations, Provenzano's attorney was asking for a

12   salaried position.  Tr. 1/10/12 at p. 53:1-4.

13       22.    Concurrently with the sale of the business, Card Tech and Provenzano

14   entered into an Employment Agreement.  Exhibit 77.

15       23.    By the Employment Agreement, Provenzano was employed by Card

16   Tech for five years as Vice President of Sales.  Exhibit 77 at 2a.  Provenzano was to

17   devote her full time and exclusive attention to perform duties for Card Tech.  Tr.

18   1/12/12 at p. 70:10-13; Exhibit 77 at 3.  The Agreement provides for termination

19   for just cause.  Just cause is defined as, *inter alia*, dishonesty, disobedience of

20   reasonable directives, breach of Card Tech policies and procedures not cured within

21   seven days after written notice, misappropriation of assets, material inaccuracy in

22   any report, any breach under the Asset Purchase Agreement.  Exhibit 77 at 6c.

23       24.    Provenzano was Vice President of Sales and reported directly to the

24   President of Card Tech.  <u>See</u> Exhibit 77 at 3.  Provenzano's role was to develop and

25   implement a sales program to increase the business of Proven Products.  She was

26   the entire sales and marketing staff of Card Tech.  Tr. 1/10/12 at p. 53:8-11; Tr.

27   1/11/12 at p. 31:24-25.

28       25.    Card Tech did not supervise or micro-manage Provenzano's work.

1  Instead, she operated autonomously, submitting reports on her activities from time
2  to time.  Tr. 1/10/12 at p. 85:4-12.  She did many things on her own initiative,
3  including: ordering inventory to have on hand, Tr. 1/12/12 at p. 18:19-24; giving
4  discounts to customers, Tr. 1/13/12 at p. 18:8-22; and seeking to register domain
5  names, Tr. 1/12/12 at p. 75:19-24.  As Vice President of Sales, she thus had duties
6  and responsibilities that involved the performance of the office or non-manual work
7  directly related to Card Tech's management policies and general business
8  operations; she customarily and regularly exercised discretion and independent
9  judgment; she executed special assignments and tasks without any supervision or,
10  at most, under only general supervision; and she spent most of her Card Tech work
11  time engaged in such duties.  Though Provenzano objects to what she refers to as
12  Card Tech's attempts to qualify her employment as exempt from overtime, her own
13  description of her employment relationship in her proposed findings is somewhat
14  more favorable to Card Tech's position than is Card Tech's own description.  The
15  Court concludes this inconsistency results from her recognition that the only
16  possible – though ultimately unsuccessful – response that she has to the evidence of
17  her wrongful conduct is her complete autonomy in her employment.

18       26.    The Employment Agreement provides for an annual base salary of
19  $55,000 per year, plus sales commissions under certain circumstances.  Exhibit 77
20  at 4a.  There was never any consideration of overtime.  Both parties agree
21  Provenzano had complete autonomy to keep her own hours and flexibility to take
22  whatever time off she wished for any reason.  Tr. 1/11/12 at p. 112:10-14; 1/13/12 at
23  p. 76:22-77:11.  The Agreement also provided that Provenzano would be entitled to
24  medical benefits, two weeks paid vacation, and reimbursement for all authorized
25  business expenses.  Exhibit 77.

26       27.    Prior to April 13, 2011, Provenzano did not indicate that she was
27  working overtime or expected to be compensated for overtime.  Tr. 1/10/12 at pp.
28  100:24-101:6, 230:11-15; Tr. 1/11/12 at p. 112:8-11; Tr. 1/13/12 at p. 76:11-21.

1    Card Tech told her she did not have to work weekends.  Tr. 1/11/12 at p. 112:19-23.

2    When Card Tech learned she was working overtime, Card Tech instructed her not

3    to do so.  Exhibit 147-1.

4         28.    Provenzano did not produce any documentary evidence of working

5    more than 40 hours per week for the benefit of Card Tech, or any requests for

6    overtime during the course of her employment.

7         29.    Provenzano admits she understood that she had an obligation to keep

8    Card Tech informed of her business activities.  Tr. 1/12/12 at p. 9:14-17.  As set

9    forth throughout these findings, the evidence establishes that – at least since

10   December 2010 – she failed to do so in material respects.

11   <u>Provenzano's conduct with regard to the presat.com website and domain</u>

12   <u>name</u>

13        30.    Provenzano makes much of the distinction between the presat.com

14   website, which she apparently owned, and the presat.com domain name, which she

15   has at all relevant times known she did not own.  Tr. 1/11/12 at p. 68:7-16; p.

16   185:7-11; Tr. 1/12/12 at p. 170:8-10.  The Court is not entirely certain that either

17   the Court or the parties or their counsel fully grasp the distinction between the two

18   concepts.  But Provenzano's efforts to defend her wrongful conduct based on this

19   technicality fail.  By at least September 25, 2009, before the execution of the Asset

20   Purchase Agreement, Card Tech made clear that it required that "presat.com" -

21   <u>both</u> the website and the domain name - be provided as part of the sale.  Tr. 1/10/12

22   at p. 57:20-24; Exhibit 21.  Farrar's email of that date specifically stresses the

23   importance to Card Tech of ownership of the <u>domain name</u>.  Exhibit 21 ("We never

24   spoke specifically regarding domain names.  I am surprised that you would not

25   include those used on your letterhead.  I really don't care about the others but it is

26   necessary that both 4cleaningcards.com and presat.com be included in the sale.").

27   And the Asset Purchase Agreement specifically provides that among the "assets of

28   the Sellers" being sold are "the following internet web sites (including without

1  limitation the content located thereon and all rights necessary to access, operate and

2  use such web sites) and domain names related to the Business:

3  www.4cleaningcards.com and www.presat.com." Exhibit 75 at 1.1(g).

4      31.    Because it was important to Card Tech to enter the market with a

5  known website and a way for customers to contact Card Tech, and a way to refer

6  people to the website for information, the presat.com website was a material part of

7  the assets Card Tech was buying.  Tr. 1/10/12 at pp. 57:22-59:5.  But for at least

8  several years before the 2010 sale, Provenzano knew that Richard Rzasa owned the

9  domain name.  Tr. 1/11/12 at pp. 68:9-69:2; Exhibit 81, p. 34.  Provenzano also

10  knew that without ownership of the domain name, one could not be assured of

11  access to the website through use of "presat.com."  See Tr. 1/11/12 at p. 68:9-16.

12      32.    Although the presat.com website could be accessed through

13  4cleaningcards.com, Provenzano clearly knew that this was not what Card Tech had

14  bargained for.  Indeed, she made efforts to keep from Card Tech the fact that she

15  did not own the presat.com domain name.  For example, on December 29, 2010,

16  she affirmatively deceived Card Tech by stating to Card Tech that the website's

17  server had possibly been hacked and that Card Tech should not use presat.com.  Tr.

18  1/10/12 at pp. 118:17-119:3; Exhibit 37-1.  There is no evidence that Provenzano

19  informed Card Tech that the website was accessible through the domain name

20  4cleaningcards.com.  Provenzano never explained the ownership of presat.com.  Tr.

21  1/10/12 at p.120:1-3.

22      33.    On January 20, 2011, Card Tech stated that it was "very concerned

23  that sales and shipments have dropped off so drastically since the start of

24  December."  Exhibit 37-2.  Card Tech had seen a drop off of about $5,000 to

25  $6,000 sales per month after early December 2010, with little or no orders through

26  the websites.  Card Tech asked the status of the problem with the presat.com

27  website; Provenzano did not respond.  Tr. 1/10/12 at pp. 120:4-121:13, 122:12-25.

28      34.    On February 2, 2011, Card Tech again asked Provenzano about the

presat.com website, and when it could "start using this site."  She delayed revealing her previous misrepresentations by stating:  "It is something we need to discuss."  Tr. 1/10/12 at pp.123:22-124:15; 1/11/12 at p. 196:5-18; Exhibit 37-3.  There is no evidence that such a discussion ever took place and Provenzano does not appear to contend that it did.

35.     Card Tech did not know that Provenzano did not own the right to access the presat.com website because she did not own the domain name until it was discovered on or about February 10, 2011.  Tr. 1/11/12 at pp. 133:19-134:12; <u>see</u> Exhibit 59; <u>see</u> Tr. 1/11/12 at p. 92:2-15.  That the website was not "down" at all, that it was "down" only for a few days, that Card Tech eventually decided to abandon it, etc., even if true, is irrelevant.

36.     There is no evidence that Provenzano ever transferred to Card Tech the presat.com website or the content, rights necessary to access, operate and use the website, or the domain names.  In fact, the evidence shows that Provenzano did not own the rights necessary to provide access to the website at any relevant time.  <u>See</u> Tr. 1/11/12 at pp. 86: 2-87:12.  Provenzano materially breached the Asset Purchase Agreement by failing to provide all necessary rights to presat.com or reveal the truth of the status of presat.com.

37.     In response to Card Tech's request for the password to the presat.com website, on or about April 20, 2011, Provenzano provided the password for 4cleaningcards.com.  There is no evidence that she provided Card Tech the password for 4cleaningcards.com before April 2011.  She did not provide the password for presat.com.  Tr. 1/13/12 at p. 73:24-25; <u>see</u> Exhibit 307.

38.     Provenzano owned the 4cleaningcards.com domain name.  That domain name linked to presat.com.  Tr. 1/10/12 at pp. 50:18-51:1.  There is no evidence that Provenzano transferred to Card Tech the content, rights necessary to access, operate and use any website, or the domain name.  Nor would it have served any purpose because it linked to a site that relied on a domain name that Card Tech

1   did not own.  See Tr. 1/11/12 at pp. 86: 21 – 87:12.

2        39.    Sales through the presat.com website were about $2,968 in 2008 and

3   increased steadily through the first three months of 2011: $3,042 in 2009; $9,304 in

4   2010; and $3,781 in the first three months of 2011.  Tr. 1/11/12 at pp. 85:20-86:5.

5        40.    Because Provenzano did not own the domain name and did not transfer

6   the website to Card Tech, since late April 2011 Card Tech has not had a website.

7   Card Tech eventually decided that it would develop its own website rather than

8   dealing with the issues created by Provenzano's conduct concerning the presat.com

9   website.  Tr. 1/11/12 at p. 48:2-11.  At the time of trial, Card Tech was in the

10  process of developing a website, but it would not be completed for several more

11  months.  Card Tech had to that point spent about $4-5,000 and expects to spend an

12  additional $2-3,000 for a new website.  Management of Card Tech has contributed

13  "untold" hours to the process.

14          Normal Procedures at Card Tech

15       41.    The parties dispute whether there were any "normal procedures" at

16  Card Tech.  Provenzano at times claims there were none, and at times explains such

17  procedures in significant detail (including in her post-trial submissions).  To the

18  extent that the nature of such procedures is relevant (which is minimal), the Court

19  generally accepts the testimony of Farrar and rejects the testimony of Provenzano,

20  as the Court finds Provenzano was not credible.

21       42.    Card Tech believed UPS account # X8535 was a "Proven Products"

22  account utilized for shipping goods from Acton, California to fill orders.  Tr.

23  1/11/12 at pp. 25:22-26:11.  Provenzano was to send end-of-day reports, provided

24  by UPS, daily.  Until November 2010, she did so.  Tr. 1/11/12 at p. 138:4-9, Exhibit

25  94-12.  Exhibits 53-1 and 150.  Some orders were invoiced and shipped by

26  Provenzano from her location in California.  For those orders Provenzano testified

27  that she prepared the invoice and sent a copy of the invoice and "UPS daily reports"

28  weekly (or sometimes less frequently) to Card Tech in Maine via fax.  Tr. 1/11/12

1  at pp. 185:1-186:1.

2       43.    Other orders were shipped from Maine.  UPS account # A3766 was

3  used to ship these orders.  For any order placed through Provenzano to be shipped

4  from Maine, Provenzano testified that she prepared and faxed to Maine a packing

5  slip.  After it was shipped, Card Tech would inform Provenzano and she would

6  prepare and send out an invoice and send a copy of the invoice to Maine.

7  Provenzano was to make deposit slips each day for payments received and fax them

8  to Card Tech in Maine.  Tr. 1/11/12 at pp. 22:23-23:3; Tr. 1/12/12 at p. 186:8-14.

9       44.    Sales proceeds received by Provenzano were to be deposited into a

10  bank account in California authorized by Card Tech (set up by Provenzano) and

11  then paid over to Card Tech in Maine.  Tr. 1/11/12 at p. 16:17-18.

12       45.    From March through November 2010, sales averaged $32,000 to

13  $35,000 per month.  Tr. 1/10/12 at p. 99:18-24.

14       Provenzano's control of bank accounts

15       46.    At Provenzano's request and with the approval of Card Tech,

16  Provenzano opened a bank account in California in the name of Prodeen, Inc.

17  (account number 3572122277—the '277 account).  This account was for the

18  purpose of Provenzano depositing any sales proceeds Provenzano received.  Tr.

19  1/12/12 at p. 105:6-11.  Provenzano would issue a check from this account to Card

20  Tech as money was received.  Tr. 1/11/12 at p. 28:14-19.  Provenzano received the

21  statements for this account and provided the statements to Card Tech.  Tr. 1/10/12

22  at pp. 95:18-96:10.  Provenzano was responsible for this bank account; she

23  maintained it in the name of her corporation for the benefit of Card Tech.  Tr.

24  1/11/12 at p.17:15-20.

25       47.    Card Tech trusted Provenzano with the bank account.  Tr. 1/11/12 at p.

26  17:11-14.  Provenzano provided reports to Maine; Card Tech relied on her for

27  accurate information.  Tr. 1/10/12 at p. 82:8-10.

28       48.    Provenzano had, and continued to maintain, a pre-existing bank

account in the name of Prodeen, Inc. (account number 3572134207—the '207 account).  Tr. 1/12/12 at p. 105:19-22.  Card Tech did not have access to this account and Provenzano never provided a statement for this account to Card Tech.  Tr. 1/12/12 at p. 110:17-21.

49.    In December 2010, and January and February 2011, there was a trend of decreasing deposits into the '277 account and a trend of increasing deposits to the '207 account.  Tr. 1/11/12 at p. 163:9-24; Exhibit 87.  One reason for that up-trend is that Provenzano was depositing Card Tech funds into the '207 account.  Tr. 1/12/12 at p. 108:12-20.  A customer named Castle Six made a $14,766.55 payment by check.  It was deposited to the '207 account, though it should have been deposited into the '277 account.  Tr. 1/12/12 at pp. 109:11- 110:2.

50.    In March and April 2011, there was a substantial increase in electronic bank transfers from the '207 account to the '277 account.  $46,000 was transferred in March and April 2011; for the entire year or year plus period $95,000 was transferred.  Tr. 1/11/12 at p. 166:13-20.  This occurred after Card Tech began asking Provenzano questions and requesting information about the UPS '046 account.  Before March 2011, there had been some months when there were no transfers between the accounts, and in other months the transfers were much smaller than the amounts transferred in March and April 2011.  Tr. 1/11/12 at p. 171:1-10.

51.    Card Tech established that Provenzano has not transferred approximately $21,000 of proceeds from sales received into Provenzano's two Prodeen accounts.  Tr. 1/11/12 at pp. 159:1 – 160:16.  Nappi admits that she still holds at least $20,000 of Card Tech's money that should have been transferred to Card Tech.  Tr. 1/12/12 at pp. 98:24-99:14.

Provenzano resists notice of the transfer of her business to Card Tech

52.    Card Tech had originally planned to send a notice to the trade that it had acquired Proven Products.  After discussions with Provenzano, Card Tech felt

it was best not to notify the customers until the inventory was relocated in Maine - which took place over the summer months - and until the business had settled into the new shipping routine.  At Provenzano's request Card Tech agreed to delay an announcement.  Tr. 1/10/12 at p. 101:21-25, Tr. 1/11/12 at p. 27:1-15.

53.     From Card Tech's perspective, the main reason that the bank account was set up in California was that Provenzano was afraid that if customers sent funds to a bank account in Maine, it might cause the customers to question what was going on.  Tr. 1/10/12 at p. 102:9-12.

54.     Provenzano kept secret from vendors that Card Tech had acquired her business.  Michael Caulley of Plastic Printing Professionals (P3), a supplier, had been dealing with Provenzano for some time.  On March 18, 2010, Provenzano instructed P3 to change the billing address to Card Tech.  Caulley asked who Card Tech was.  She responded:  "We have set up an accounting, marketing communications and east coast shipping office. . . . "  Tr. 1/10/12 at pp. 148:19-152:17, Exhibit 79-312 and 313.  Before April 2011 Provenzano deliberately referred to Card Tech as an "investor," though it was not.  In early April 2011, Provenzano told George Mouchet, her website designer, for the first time that she had sold her company to Card Tech and she was hired to do its sales.  Tr. 1/11/12 at pp. 77:18-78:4, Tr. 1/10/12 at p. 168:1-3, Exhibits 79-128, 81-42.

55.     In December 2010, Card Tech decided that enough time had passed for an announcement that it had acquired Proven Products.  On December 7, 2010, Card Tech told Provenzano that a notice must go out by mid-December, and asked her to draft a letter.  Tr. 1/10/12 at pp. 101:21-102:2, 104:8-21; Tr. 1/11/12 at pp. 27:16-20, 28:20-23, 198:12-20; Exhibit 94-8.  Card Tech determined this announcement was important for customers to know who Card Tech was, to have administrative control in Maine, and most importantly to get bank accounts directed to Maine.  Tr. 1/10/12 at pp. 102:4-8, 104:19-106:7.

56.     On January 18, 2011, Card Tech again asked Provenzano for an

announcement letter, and directed that certain points be included.  Tr. 1/10/12 at pp. 106:14-110:15; Exhibit 94-4, 5.  Provenzano responded the next day that she would put something together.  Tr. 1/10/12 at pp. 111:23-112:12; Exhibit 94-3.

57.    On February 1, 2011, Card Tech received from Provenzano, by fax, a draft outline as a proposed notice to the trade.  Tr. 1/10/12 at pp. 112:16-113:4; Exhibit 94-10.  It did not include any of the points requested.  It did not satisfy Card Tech's request that the marketplace be informed of Card Tech ownership and that accounting would be in Maine; and it contained false statements – for example, that Card Tech was an investment company and that the transaction occurred January 31, 2011.  Tr. 1/10/12 at pp. 112:16-7, 114:5-115:22, Tr. 1/11/12 at p. 203:5-12; Exhibit 94-10.  It seemed to Card Tech that Provenzano was resisting notice of the actual circumstances.  Tr. 1/10/12 at p. 116:8-13.  Provenzano testified that she thought that since it was now almost a year since the purchase "it would be more of a problem to say 'Hey, guess what, I sold the company a year ago but you're only finding out about it now.'"  Tr. 1/11/12 at p. 203:12-15.  The Court agrees with Card Tech.

Purchases of inventory from P3

58.    On or about November 30, 2010, Provenzano issued a purchase order to P3 for 15 cases (500 per case) of item #207, with the following instructions: "ALSO VERY, VERY IMPORTANT:  INVOICE TO ME IN ACTON, CA! PLEASE CHANGE THE BILLING ADDRESS BACK TO ACTON, CA."  Card Tech was not aware of this order.  Tr. 1/10/12 at pp. 157:16-158:11; Exhibit 79-310, 311.

59.    On or about December 9, 2010, Provenzano ordered 18,200 pieces of item # 200 and made note to bill to Proven Products in California; and she directed the use of UPS X8535 account.  Tr. 1/10/12 at pp. 160:14-161:18; Exhibit 79-239.

60.    On or about December 27, 2010, Provenzano ordered from P3 100,000 units of item # 207.  It was billed to her in Acton, California.  Exhibit 50-1.  This

was for a product sold to a customer in Europe; Card Tech had previously informed Provenzano that it had 300,000 of this item in production.  Tr. 1/10/12 at pp. 130:17-131:11.  On the same date Provenzano also ordered from P3 40,000 units of item # 200, which is the most popular card Card Tech sold.  At the time, Card Tech had inventory which Provenzano knew was being packaged at that time in California.  Tr. 1/10/12 at p. 135:4-14, Exhibit 50-2.

61.     On or about January 4, 2011, Card Tech received two invoices from P3 for these orders, though Card Tech had no knowledge of these transactions.  One invoice was addressed to Provenzano, individually, in Acton, California.  Card Tech was shocked when it received the invoices for these large orders.  Normal procedure would be for Provenzano to coordinate with Card Tech in Maine any purchases of inventory Provenzano wished to make, but Provenzano did not coordinate this purchase with Maine.  These invoices caused Card Tech concern. Tr. 1/10/12 at pp.129:9-135:17.  Provenzano contends that she had ordered goods in the past and been commended for her actions and reimbursed for the purchases.  As with her other wrongful conduct, Provenzano had a purported explanation.  She contended that she was concerned that products Card Tech had ordered for manufacture in China would not be ready in time to deliver to the customer, and that Card Tech's inventory levels were low.  1/13/12 at pp. 12-13.  The Court concludes that this purchase was significantly different – especially in light of the fact that Provenzano went to great lengths to be sure Card Tech was unaware of the purchase.  The Court does not find Provenzano's testimony credible.  Even if Provenzano were truthful in this case, her after-the-fact explanation does not justify concealing her conduct from Card Tech, both before and after she ordered the goods.

62.     Card Tech did not contact Provenzano for an explanation because it hoped this was an oversight.  Card Tech decided to wait until the end of the month to see if Provenzano would provide an explanation.  No explanation was ever

1 | provided.  Tr. 1/10/12 at 135:19-22.

2 |     63.    On January 5, 2011, P3 confirmed to Provenzano that as of December

3 | 31, 2010, she had not paid invoice number 8703.  Provenzano responded that she

4 | had no record of it and hoped it was not sent to another office.  Tr. 1/10/12 at p.

5 | 163:11-24; 1/12/12 at p. 27:7-13; Exhibit 79-295.  On or about January 31, 2011,

6 | P3 followed up to ask Card Tech about payment of outstanding invoices.  Tr.

7 | 1/10/12 at pp. 177:20-179:1; Exhibit 79-257.

8 |     64.    Provenzano tried to conceal from Card Tech that she had purchased

9 | inventory for her own account.  Provenzano spoke to a P3 representative on the

10 | phone and told P3 that the email was sent to Card Tech in error and that P3 should

11 | send her the invoices.  Tr. 1/10/12 at p. 181:7-11.  P3 told Provenzano "if it's OK

12 | with you," P3 would tell Card Tech her request for payment was sent to the wrong

13 | account.  Provenzano responded:  "Thanks, that should be fine."  Tr. 1/12/12 at pp.

14 | 28:12-29:8.

15 |     65.    On January 31, 2011, Card Tech responded to P3 that it had no record

16 | of outstanding invoices.  P3 replied that the email requesting payment was sent to

17 | Card Tech in error; it should have gone to a different company.  Tr. 1/10/12 at pp.

18 | 178:9-16, 183:9-21; Exhibit 64.  P3 justifiably interpreted Provenzano's "Thanks,

19 | that should be fine" response as condoning this misleading strategy.  Tr. 1/10/12 at

20 | pp. 182:6-183:4.

21 |     66.    On about January 31, 2011, Card Tech asked Provenzano if she was

22 | holding any P3 invoices.  Provenzano clearly knew what Card Tech was referring

23 | to, and she admits that she deliberately misled her employer by denying that she

24 | had the invoices.  See Tr. 1/12/12 at pp. 32:2-33:15.  The Court finds Provenzano's

25 | explanation of why this answer was acceptable to be simply another step in her

26 | efforts to conceal her wrongdoing.

27 |     67.    Provenzano did not inform Card Tech that she had purchased

28 | inventory from P3, and Card Tech would have known that only if it needed the

inventory.  Tr. 1/13/12 at p. 53:17-24.  Provenzano admitted – and the Court finds –

that she breached her obligation to be truthful to her employer by encouraging a

vendor to withhold material information from Card Tech.  <u>See</u> Tr. 1/12/12 at p.

30:20-24.

<u>Card Tech's investigation reveals Provenzano is shipping with an unknown
UPS account, not reporting sales, and not depositing sales proceeds into the
approved '277 account.</u>

68.     Card Tech received UPS daily reports from Provenzano through

November 2010; she stopped sending them in December 2010.  Tr. 1/10/12 at p.

197:2-6.  On or about January 7, 2011, Card Tech noted to Provenzano that it had

not received UPS end-of-day reports since November 2010.  Provenzano responded

that she faxed them in December.  Card Tech did not receive any UPS dailies from

Provenzano in December, but did receive other faxes from Provenzano in

December.  Tr. 1/10/12 at pp. 202:23-204:9; Exhibit 94-12.

69.     Also on or about January 7, 2011, Provenzano sent a handwritten list

confirming shipments, and days with no shipments, in December 2010.  Tr. 1/10/12

at pp. 205:15-207:13; Exhibit 74.  Sending such a handwritten list was unusual.  Tr.

1/10/12 at p. 208:2-5.  There was only one discrepancy with the information Card

Tech had.  Tr. 1/10/12 at pp. 206:15-18, 208:13-17.

70.     Having received the P3 invoices and not having received UPS end-of-

day reports, Card Tech investigated Provenzano's conduct.  It decided to test the

website by arranging for several orders to be placed to see if the billing would be

done in the normal manner.  Tr.1/10/12 at pp. 188:22-189:3.

71.     Card Tech asked three individuals to place such orders: Hibscher,

Robert, and Lakhani.  Hibscher placed an order, and a few weeks later Card Tech

received a package from Hibscher that contained a sealed carton with Card Tech

products, in Card Tech trade dress, with a Card Tech packing slip indicating that

the order was placed by Hibscher on January 11, 2011.  Card Tech expected that it

would have received an invoice that same day and the payment would have been

deposited into the '277 account the same day.  But Card Tech did not receive invoicing for that shipment at that time, and the money was not then deposited into the '277 account.  Tr. 1/10/12 at pp. 188:22-193:7.  Instead, Card Tech received a batch of invoices at the end of February that accounted for some sales in January and February.  There was a new numbering system used on those invoices.  Hibscher's invoice was among these.  Tr. 1/11/12 at p. 56:9:17.

72.   Card Tech then decided to conduct another test purchase.  Card Tech wanted to give Provenzano the benefit of the doubt by placing another order to see if the results would be the same.  It did not contact Provenzano directly to ask for an explanation.  Tr. 1/11/12 at p. 50:12-19.  It requested Robert to place an order from presat.com or 4cleaningcards.com.  Shortly thereafter a package was received from Robert in the same fashion as the Hibscher package, with a Card Tech packing slip indicating "sold to Stacy Robert" and that the order was placed on February 2, 2011.  Tr. 1/10/12 at pp. 193:16-195:18; Exhibit 1.  Card Tech received the invoice "quite a long time after" the order was placed.  Tr. 1/11/12 at p. 56:19-24.

73.   The shipping label on the Robert package indicated that it was shipped using a UPS account in the name "Proven Products" - the UPS '046 account.  Tr. 1/10/12 at pp. 195:21-196:24; Exhibit 1.  Although Provenzano had earlier expressed concern about keeping her personal shipping separate from Card Tech's shipping, this was the first indication Card Tech had of this UPS '046 account.  Tr. 1/10/12 at p. 197:2-11; Tr. 1/11/12 at p. 61:3-20.  Card Tech also made a test purchase through Lakhani.  Card Tech did receive payment for that purchase.  Tr. 1/11/12 at p. 130:5-16.  Contrary to Provenzano's implication, this establishes only that on one of the three test orders, Provenzano promptly and properly accounted for the sale.

74.   Card Tech decided to wait to see if Provenzano would come forward with an explanation for this situation, but she did not offer any explanation.  Tr. 1/10/12 at p. 125:12-20.

75.     On or about April 4, 2011, Card Tech requested a UPS end-of-day report from Provenzano.  Later that day, instead of sending the UPS daily report, Provenzano sent a copy of a shipping label to a customer, UTI.  Card Tech saw that the shipment to UTI was shipped via Provenzano's UPS '046 account.  Tr. 1/10/12 at pp. 222:1-224:5.

76.     The next day, April 5, Card Tech asked Provenzano about that UPS '046 account.  In response, after consulting with her counsel, she stated that it was for personal shipping.  Tr. 1/12/12 at pp. 56:3-57:12.  Provenzano never provided a UPS daily report for the UPS '046 account.  Tr. 1/10/12 at p. 197:9-11, 15-17.  Evidence at trial established that at least 65-70 shipments Provenzano sent via her UPS '046 account were business-related, not personal.  Tr. 1/10/12 at pp. 232:15-242:25, Exhibit 151.  The test purchase by Robert and a further test purchase by Hibscher were shipped via Provenzano's UPS '046 account.  Tr. 1/10/12 at pp. 197:21-198:5; Tr. 1/10/12 at p. 195:21-23, Exhibit 89, Bates numbers 269, 272, 273.  Once again, Provenzano provided an explanation for her apparent deception:  When using the UPS website, the default for shipping is the account that was last used.  While that is true, the Court finds Provenzano's implied claim that she simply forgot to reset the account number after making a person purchase on 65 to 70 shipments during this period is not credible.  Even if that were true, Provenzano's response that the account was for personal shipping was misleading under these circumstances.

77.     Card Tech directed Provenzano to provide accurate sales and collections information for October 2010 through March 2011.  On or about April 4, 2011, Card Tech received from Provenzano a summary report of sales.  Card Tech had no record of any of the sales on that report, and had never received copies of invoices for those sales.  The invoice numbering had changed.  Tr. 1/10/12 at pp. 214:18-215:20, 216:19-219:3, 220:10-221:4, Exhibits 5-1, 5-2, 27 and 74-1.

78.     Provenzano had started a new invoicing system in 2011, but did not

1    inform Card Tech.  The new sequence applied to website orders, and all orders with

2    this new invoicing system were shipped on the UPS '046 account.  Test purchases

3    by Hibscher and Robert were invoiced on Provenzano's new invoice numbering

4    system.  Tr. 1/12/12 at pp. 46:10-25, 47:10-20, 48:3-51:11; Exhibit 89.  Provenzano

5    attempts to deflect Card Tech's criticism and concern by stating that she had total

6    autonomy, and therefore could unilaterally institute a new numbering system.  Even

7    assuming she had the authority to do so, her implementation of this measure

8    without notice of or explanation to Card Tech was justifiable cause for concern.

9         79.    Card Tech compared Provenzano's April sales report to the

10   handwritten report of December 2010 sales and found that the dates of activity did

11   not match.  For example, the handwritten report stated no shipments on December

12   1, 2, and 3 through 10, whereas the typed report received in April showed

13   shipments on the 1st, 8th, and 10th.  Tr. 1/10/12 at pp. 220:16-221:4.

14        80.    From these documents Card Tech concluded that Provenzano kept two

15   sets of documents for December, that the information in the handwritten note was

16   incorrect, and that Provenzano was not being honest with Card Tech.  Tr. 1/10/12 at

17   pp. 218:16-19, 221:8-17.

18        81.    Card Tech compared the invoice numbers provided by Provenzano for

19   website sales from November 2010 through early April 2011.  Card Tech found

20   numerous gaps in the invoice numbering.  The website prepares invoice numbers

21   automatically.  The gaps indicated to Card Tech that there were orders Provenzano

22   did not report to Card Tech.  Tr. 1/11/12 at pp. 52:23-53:22, 54:5-9, 141:14-22.

23        Provenzano's new website

24        82.    Card Tech approved a trip to Europe to take place in February 2011, to

25   visit a customer and to visit Disko, a supplier, ostensibly for training.  Tr. 86:10-19,

26   Tr. 1/12/12 at p. 69:15-20.  On about February 21, 2011, days after returning from

27   this trip, Provenzano told Mouchet that she wanted a website separate from Proven

28   Products, devoted entirely to Disko, with the same structure as Proven Products.

1   Tr. 1/11/12 at pp. 72:13-73:2, Tr. 1/12/12 at p.69:6-25; Exhibit 81.  Provenzano did

2   not inform Card Tech that she was seeking to establish a Disko website.  Tr.

3   1/12/12 at p. 71:4.  She told Mouchet that she had made an arrangement with the

4   Disko company to be their exclusive distributor in the Americas.  Tr. 1/11/12 at p.

5   77:1-5.

6        83.    On about March 19, 2011, Provenzano told Mouchet:  "I would like to

7   get this website up and running ASAP, including a shopping cart.  It's going to

8   have to be a Disko domain in the U.S."  Tr. 1/11/12 at p. 73:18-22: Exhibit 81-50.

9   Provenzano did not inform Card Tech. Tr. 1/12/12 at p. 71:4.  Provenzano contends

10  that she had total autonomy, and that there is no evidence that she was required to

11  inform Card Tech of the domain name or website.  While this is factually accurate,

12  the Court finds that the only reason Provenzano would not immediately tout such a

13  substantial coup to Card Tech is that she was in the process of considering leaving

14  Card Tech – or had already decided to do so – and that she planned to appropriate

15  this opportunity for herself in breach of her duty to and agreement with Card Tech.

16  She did not instruct Mouchet to register the website in Card Tech's or Proven

17  Products' name.

18       84.    On April 2, 2011, Provenzano asked Mouchet to begin work on the

19  Disko website, stating:  "I will need to get this up and going ASAP so I can

20  continue making [a] living."  She also asked Mouchet to register the domain name

21  disko-us.com, and to email her only at an aol.com email address:

22  snapprotek7@aol.com.  She further asked that he not use any of the 4cleaningcards

23  or presat email addresses.  Tr. 1/11/12 at p. 76:1-25; Exhibit  81-44, 45, 48.  By this

24  date, if not sooner, Provenzano had clearly decided to end her employment with

25  Card Tech (or that Card Tech would be terminating her), and that she would hide

26  her misappropriation of the Disko business from Card Tech.  Provenzano admits

27  that as of this date she believed Card Tech would terminate her, and contends that

28  on April 5 Card Tech did decide to terminate her.  This, of course, does not justify

- 23 -

1   hiding her April 2 activities with regard to Disko.

2          85.    On April 7, 2011, Provenzano asked Mouchet if he had the template

3   for presat.com and 4cleaningcards.com so she could use it later. She wanted to be

4   sure he had all the files associated with the website. Tr. 1/11/12 at pp. 78:17-79:10;

5   Exhibit 81-42.

6          86.    Again on April 23, 2011, Provenzano told Mouchet she wanted to be

7   sure he had all orders, customers, purchases, and other records from the presat.com

8   website. Tr. 1/11/12 at p. 82:8-21, Exhibit 81-30.

9          87.    At Provenzano's request all of the records from the presat.com website

10  were put onto a new website for Provenzano, prodeeninc.com (sometimes referred

11  to as the "disko website"). Mouchet cloned the presat.com website to make

12  Provenzano's new website, so that all the information from the presat.com website

13  was on the disko.com website. Tr. 1/11/12 at p. 83:3-15.

14         Provenzano's claimed expenses

15         88.    Provenzano was instructed that expenses for the European trip should

16  be reasonable. Card Tech requested a trip report but Provenzano never provided

17  one. Tr. 1/10/12 at p. 87:4-16; Tr. 1/13/12 at p. 63:23-25.

18         89.    Provenzano submitted a request for expenses. Card Tech believed

19  certain expenses were extraordinarily high: a chauffeured car for about $398, a

20  meal with clients for about $500 (for four people), telephone expenses of about

21  $500. The hotel bill for London for four nights was $2,686. Provenzano stated that

22  the rate was $395 per night, but that other things such as taxes were included on the

23  bill. Tr. 1/13/12 at pp. 64:16-24-65:19.

24         90.    In or about early March 2011, Card Tech and Provenzano each

25  received a cease and desist letter from the owner of a patent. Card Tech decided to

26  stop selling the product and informed the patentee. Tr. 1/11/12 at p. 30:4-22. On

27  March 5, 2011, Card Tech also informed Provenzano. Tr. 1/13/12 at pp. 72:24-

28  73:4; Exhibit 116. Provenzano nevertheless hired a lawyer to represent her in the

1   matter after March 5, 2011.

2          Termination of Provenzano's employment

3          91.     Card Tech had grounds to terminate Provenzano by at least April 5,

4   2011.  On April 13, 2011, Card Tech requested specific information from

5   Provenzano.  When Card Tech sent its letter, it had not yet decided to terminate her.

6   Tr. 1/11/12 at pp. 113:13-17; 118:13-17.  Provenzano was seen as an important part

7   of the Card Tech operation and Card Tech wanted to work with her.  Tr. 1/10/12 at

8   p. 125:14-17, Tr. 1/11/12 at p. 31:21-22.  Provenzano was given a short time to

9   respond to the letter because Card Tech knew that some damage had been done, but

10  it did not know what else had occurred, and it did not want to delay and risk more

11  damage.  Tr. 1/11/12 at pp. 113:25-114:5.

12         92.     Provenzano responded that she could not get the information within 48

13  hours.  Tr. 1/11/12 at p. 115:2-4.  Card Tech decided not to give Provenzano more

14  time.  Tr. 1/11/12 at p. 114:2-5.

15         93.     Provenzano was officially terminated by an email sent April 18, 2011.

16  Termination was effective April 25, 2011.  Exhibit 78.  The email stated: "Your

17  employment is being terminated for just cause within the meaning of your

18  employment agreement with the company.  The grounds for termination include,

19  but are not necessarily limited to, the following."  Id.  The email then lists a number

20  of non-exclusive grounds for the termination.  Id.  In addition, the email referred to

21  the instant litigation and stated: "The facts stated in our complaint and in [Farrar's]

22  declaration establish numerous other grounds for terminating your employment."

23  Id.  Farrar testified that one of the "prime" reasons for terminating Provenzano was

24  that she was not being truthful and honest with Card Tech.  Tr. 1/10/12 at pp.

25  229:24-230:11.  The Court agrees with this analysis.  As described in these

26  Findings, there were numerous occasions on which Provenzano had not been

27  truthful or honest with Card Tech.  In addition, the Court finds credible Farrar's

28  testimony that Card Tech did not terminate Provenzano to avoid paying her under

the Employment Agreement, paying her for overtime, or paying her travel expenses.  Tr.  1/10/12 at p. 230:3.  Provenzano's last payment for her employment was probably April 15, 2012. Tr. 1/11/12 at p. 107:18-20.

94.    For all of the reasons described previously, Card Tech had just cause to terminate the Employment Agreement with Provenzano.

Provenzano's unauthorized use of Card Tech trademarks and trade dress

95.    After her employment with Card Tech was terminated, Provenzano continued to engage in the business of selling technical cleaning cards; she uses the '207 account for that business.  Tr. 1/12/12 at p. 121:7-18.

96.    Since May or June 2011 Provenzano has been selling the same technical cleaning products in packaging very similar to Card Tech packaging.   Tr. 1/13/12 at p. 83:5-16.  The products Provenzano has been selling are similar to the products sold by Card Tech and directly competitive.  Exhibits 26 and 46. Provenzano does not contend that Card Tech approved, authorized, or in any way consented to Provenzano's use of Card Tech's trademarks or trade dress competing with Card Tech.

97.    Provenzano mimicked Card Tech packaging because all the templates were there, the artwork plates were already there, the cost to change was significantly less than going into an entirely new design; she saved herself a considerable amount of money.  Tr. 1/13/12 at p. 90:15-20.

98.    In about June 2011, Card Tech discovered a prodeen.com website.  It had the same overall appearance and impression as the presat.com website, offered directly competing products, and displayed the same packaging as Card Tech packaging.  Tr. 1/10/12 at pp. 247:13-248:7, 248:24-251:3, 89:15-91:3; Exhibit 46.

99.    On May 12, 2011, nearly three weeks after Provenzano was terminated by Card Tech, Provenzano issued her P.O. # 0716-621 to Diamond Wipes for a package design that is similar to the package design conveyed by Provenzano to Card Tech.  Tr. 1/12/12 pp. 128:10-133:17.  Provenzano used that design after

1   April 2011.  Tr. 1/12/12 at p. 134:2-3.

2      100.   At the time of trial, Provenzano was still offering and selling products

3   in packaging that looks like the Card Tech design.  Tr. 1/10/12 at pp. 251:10-252:9;

4   Tr. 1/12/12 at pp. 127:23-25, 129:14-149:3; Exhibit 35; Exhibit 128-4.

5   Provenzano's website shows that she has been offering and selling technical

6   cleaning products for sale using Card Tech's trademarks, or confusingly similar

7   marks, including *at least* the marks PRESAT, DIAMOND TECHNOLOGY, the

8   Three Drop symbol, EASY CLEAN CARD, and EASY SWAB.  Exhibit 46.

9      101.   The overall appearance of Card Tech's packaging, taken as a whole, is

10   not functional -- packaging can have many different appearances and there are other

11   equally efficient ways to arrange images in connection with instructions (and

12   indeed other images).  Many of the aspects of the packaging copied by Provenzano

13   are not related to instructions at all; while some images may be suggestive, other

14   suggestive images could be used.  The overall appearance of Card Tech's

15   packaging, taken as a whole, is not functional.

16      102.   Card Tech acquired from Provenzano and uses the mark DIAMOND

17   TECHNOLOGY and a "magnifying glass and dollar bill" symbol.  Tr. 1/10/12 at

18   pp. 64:6-8, 67:21-68:1, Tr. 1/11/12 at pp. 184:13-185:5; Exhibit 26-31.  Some time

19   prior to August 25, 2011, Provenzano changed the use of DIAMOND

20   TECHNOLOGIES on her website to DIAMOND ICE TECH.  Exhibit 46-15.

21   Those marks are likely to be confused, though no evidence of actual confusion was

22   presented.

23      103.   As of the time of trial, Provenzano was still offering and selling

24   products in packaging similar to Card Tech packaging with an image of a diamond

25   and in other respects the same as the Card Tech package that uses the trademark

26   DIAMOND TECHNOLOGIES.  Provenzano admits the diamond image could be

27   confused with the DIAMOND mark.  Tr. 1/12/12 at pp. 143:7-144:24.

28      104.   As of the time of trial, Provenzano was still offering and selling

1  packaging that is very similar to the Card Tech package bearing the mark PRESAT.

2  Tr. 1/12/12 at pp. 145:22-148:8; Exhibit 119.  Provenzano admitted her packaging

3  duplicates the entire format of the Card Tech package except that "saturated" is

4  substituted for SAT.  Tr. 1/12/12 at pp. 147:25-148:2.  A person seeing PRESAT

5  and presaturated would think there is some commonality between the two.  Tr.

6  1/11/12 at p. 81:8-15.  PRESAT and PREsaturated are likely to be confused.

7      105.   Before she was terminated from Card Tech, Provenzano asked

8  Mouchet about names similar to the names she had conveyed to Card Tech.  Tr.

9  1/11/12 at p. 80:12-81:7.  Also, Mouchet had asked her about registering disko.us

10 to prevent confusion with disko-us.com, to which Provenzano replied, "yes."

11 Exhibit 81-44, 45.

12     106.   As of the time of trial, Provenzano was offering technical cleaning

13 products for sale through a website, prodeeninc.com, that was substantially similar

14 in overall impression to the presat.com website used for Card Tech's business in

15 2010, which was an asset Provenzano had agreed to convey to Card Tech.  Tr.

16 1/10/12 at p. 89:3-25; Exhibit 75.  Mouchet cloned the presat.com website to make

17 Provenzano's new website.  Tr. 1/11/12 at p. 83:7-9.  The only difference is that

18 some images are not displayed on the website currently.  Tr. 1/12/12 at pp. 131:11-

19 14, 135:15-18.

20     107.   The overall appearance of Card Tech's website is not functional - there

21 are many different "looks" for websites and there are other equally efficient ways to

22 arrange a website.  The overall appearance of Card Tech's website, taken as a

23 whole, is not functional.

24     108.   Money deposited to Provenzano's '207 account in May, June, and July

25 2011, totaled $107,022, all of which appeared to be business deposits.  Tr. 1/11/12

26 at p. 168:18-25, p. 169:19-23.  There was a clear upward trend of deposits into this

27 account.  Tr. 1/11/12 at p. 169:16-18.  In August through December 2011, monthly

28 sales have been $15-20,000 per month.  Tr. 1/12/12 at p. 122:13-25.  Provenzano's

1  total sales from May until the preliminary injunction are, therefore, $167,022.

2       109.   Provenzano used trademarks and trade dress that are very similar to the

3  Card Tech marks.  She knew they were similar, having transferred the trademarks

4  and trade dress to Card Tech.  She intended to use the similar marks, and did so

5  because it was less expensive for her.  She knew and understood that marks that are

6  similar, even if not identical, would infringe.  To the extent she contends otherwise,

7  the Court finds her testimony incredible or irrelevant.  The goods in connection

8  with which the marks are used are identical and directly competitive with Card

9  Tech goods; and the goods are inexpensive.  Provenzano and Card Tech use similar

10  marketing channels, and Provenzano used a website (a marketing channel) that is

11  identical in overall look and feel.  There is a likelihood of confusion between

12  Provenzano marks, including her website, and Card Tech marks.  No evidence of

13  actual confusion was submitted.

14            Provenzano used Card Tech customer information

15       110.   Provenzano sold and conveyed all of her business records and

16  customer list information (among other things) to Card Tech.  Exhibit 75.

17  Thereafter, Provenzano was Vice President of Sales and reported directly to the

18  President of Card Tech.  See Exhibit 77 at 3.  Provenzano was the entire sales and

19  marketing staff of Card Tech.  Tr. 1/10/12 at p. 53:8-11; Tr. 1/11/12 at p. 31:24-25.

20       111.   While Provenzano was still an officer of and employed by Card Tech,

21  she instructed Mouchet to be sure he had in his files "all the information from the

22  Presat website such as all orders, customers, best products purchased, etc., and

23  whatever other records [Provenzano] gathered during the years of this website up

24  and running."  Tr. 1/12/12 at p. 87:9-20.  Thus by having Mouchet clone the

25  information into her new website, Provenzano took for her own use information she

26  had sold to Card Tech, and breached the Asset Purchase Agreement.  She used the

27  information in her own website, used marks on her website that are similar or

28  identical to Card Tech trademarks, and solicited sales of goods that used without

1   permission Card Tech trademarks and trade dress.

2       112.   Provenzano was aware of an economic relationship between Card

3   Tech and its customers that probably would have resulted in a continuing

4   relationship with those customers and economic benefit to Card Tech.  Indeed, that

5   was the purpose of conveying the customer list and information to Card Tech.

6   While it appears likely that Provenzano solicited Card Tech's customers, Card Tech

7   provided no evidence of any actual solicitations.  Card Tech has provided no facts

8   that would justify an award of damages.  Card Tech's First Amended Complaint

9   seeks actual damages according to proof at trial, but Card Tech has not proven - or

10  even requested - a specific sum.

11          Defamatory statements

12      113.   Provenzano sent emails to third parties stating that Card Tech swindled

13  her out of her business, Card Tech had no clue how to run a business, Card Tech

14  stole her company, and Card Tech was trying to turn vendors and suppliers against

15  her so they would not want to do business with her. Tr. 1/12/12 at pp. 89:16-91:10,

16  94:15-25, 95:10-96:8; Exhibit 83-93; 79-56.

17      114.   There is no evidence that Card Tech swindled her out of her business

18  or was trying to turn vendors against her.  In fact, this Court has determined that no

19  such conduct occurred.  Failing to pay on a note when there is a dispute whether

20  payment continues to be due is not "swindling."

21      115.   However, Card Tech has not established that any recipient of the

22  emails knew Provenzano was referring to Card Tech or Farrar.

23      116.   Such statements conveyed a negative impression, were mean-spirited,

24  and painted Card Tech in a negative light. Tr. 1/12/12 at pp. 91:24-25, 93:6-8,

25  94:15-25.  However, there is no evidence that any of the recipients of the emails

26  thereafter declined to do business with Card Tech, or that Card Tech even wished to

27  do business with these particular entities.  Card Tech's First Amended Complaint

28  seeks general damages for this wrongful conduct, but Card Tech has not requested a

1    specific sum and there is no evidence of actual damage.

2        <u>Provenzano was not truthful with or concerning Card Tech</u>

3        117.   Provenzano failed to disclose and then avoided disclosing the status of

4 the presat.com domain name and website.  She failed to disclose a liability in

5 breach of the Asset Purchase Agreement.

6        118.   Provenzano had little or no documentary evidence for her

7 explanations.  Her response to written requests was often 'we need to talk about it,'

8 and often no response at all.

9        119.   The Court does not believe - and Card Tech was justified in not

10 believing - that Provenzano ordered and paid for more than ten thousand dollars of

11 inventory without telling Card Tech, planning to request reimbursement only if it

12 was needed at an unknown time in the future.  That Provenzano had "total

13 autonomy" is irrelevant as she took affirmative steps to hide this transaction from

14 Card Tech.

15        120.   Provenzano misrepresented that Card Tech was an investor.  She

16 misrepresented her activities to Card Tech.  Provenzano shipped product using her

17 UPS '046 account and deposited the proceeds into her '207 account, without

18 reporting the activity to Card Tech.  Card Tech would not have known about the

19 transactions, Tr. 1/12/12 at pp. 112:6-111:2, but for its investigation.  Provenzano

20 misappropriated customer information that she had sold to Card Tech.

21 Provenzano's contention that in order for a misrepresentation to have occurred, it

22 must be "material" is simply incorrect.  Provenzano's repeated misrepresentations

23 are relevant to the Court's analysis of the evidence in this case.  In any event, many

24 of Provenzano's misrepresentations were material.

25        <u>Provenzano's testimony was evasive, contradictory, disingenuous, and</u>

26 <u>generally lacking in credibility</u>

27        121.   Provenzano contended she was a good and loyal employee, but her

28 own testimony established that she was not.  She testified that her purchases of

1   inventory without Card Tech's approval - or even its knowledge - were for the good

2   of Card Tech in case it needed the inventory, Tr. 1/12/12 at p. 19:18-20:1.  She then

3   testified that the payment for a purchase by Castle Six properly went into her

4   separate '207 bank account because it was a purchase of something not in Card

5   Tech/Proven Products inventory, Tr. 1/12/12 at pp. 109:18-110:2.  She stated that

6   she didn't have the responsibility for paying the bills (except in the vendors'

7   minds), Tr. 1/12/12 at p. 184:13-18, but she deliberately ordered inventory and

8   directed that it be billed to her personally, Tr. 1/12/12 at p. 21:4-6; she directed a

9   vendor (P3) to change billing to Card Tech International but described Card Tech as

10  her east coast office, Exhibit 79-312-313.  Thus, if Provenzano was viewed as

11  financially responsible it was because of her own misrepresentations.  The Court

12  does not find credible Provenzano's allegation that it was Farrar who wanted the

13  Card Tech purchase to remain a secret due to his alleged concerns about a "non-

14  compete."  Provenzano also testified:  "We" were the exclusive distributor for

15  Disko.  Tr. 1/12/12 at p. 72:22-23; Proven Products (which Card Tech had

16  purchased) was a distributor for Disko, Tr. 1/12/12 at p. 78:17-20; Card Tech did

17  not assume her rights as exclusive distributor for Disko because Card Tech was the

18  distributor based only on her personal relationship with Disko, Tr. 1/13/12 at pp.

19  78:3-81:16.  She also testified both that she presumed Card Tech had an interest in

20  Disko, Tr. 1/12/12 at pp. 78:21-79:1, and that Card Tech had no interest in Disko,

21  Tr. 1/12/12 at pp. 79:2- 80:13.  She testified she started a new invoicing system that

22  deliberately was not numbered sequentially, Tr. 1/13/12 at p. 56:8-11; but then

23  stated that the non-sequencing was from a typographical error multiple times, Tr.

24  1/13/12 at pp. 56:12-58:6.  She testified that she asked Mouchet to get a new,

25  separate Disko website up and running ASAP on March 19, 2011, Tr. 1/12/12 at p.

26  73:8-25, Exhibit 81; but also stated she did not "initiate" a Disko website before

27  April 5, 2011, Tr. 1/12/12 at p. 70:18-25.

28          122.   Provenzano admitted several times she was not being honest with Card

- 32 -

Tech.  On other occasions her responses were technically true but misleading.  For example, it is technically true that the "purpose" of the UPS '046 account was for personal items, but in fact she used it over and over to ship business items.  Tr. 1/12/12 at p. 56:3-25.  It is technically true that Provenzano was not "holding" any P3 invoices, because she did not have the physical invoices, Tr. 1/12/12 at p. 32:2-21, but it is misleading.

123.   Provenzano's responses to questions at trial were frequently evasive, seeking to be technically true but not answering the entire question; and sometimes not responsive at all.  For example, "Q: Were you trying to associate that product with the earlier Diamond Technologies by using the diamond?  A: The product itself is distinctive," Tr. 1/12/12 at p. 144:8-10; "Q: [C]onceivably a customer could receive, if they got a head cleaning card, this type of design; correct?  A. That design is not on the website any longer."  Tr. 1/12/12 at p. 135:15-18.

124.   Provenzano had a prepared excuse for much of her wrongful conduct.  Some of the excuses were incredible on their face.  Others the Court found not to be credible based on her demeanor and manner while testifying, as well as contradictory documentary evidence, and the testimony of Norman Farrar, whom the Court found to be credible.  Provenzano also often tried to excuse her wrongful conduct by claiming she was not a lawyer or didn't know that what she was doing was wrong.  Nevertheless, Provenzano continued to engage in her infringing conduct even after this Court issued a preliminary injunction.  Docket No. 105.

125.   It appears to the Court that, while Provenzano may have entered into the Asset Purchase Agreement and Employment Agreements intending to perform - albeit reluctantly - she soon after developed "seller's remorse" and began efforts to develop her own business once again.  In addition, she concluded that Farrar and Card Tech had stolen her business from her.  Based on her actions, she appears to believe that this justifies whatever conduct she chooses to engage in.

# CONCLUSIONS OF LAW

### A.    Plaintiff's claims

*Claim 1*: Breach of Contract

1.    Card Tech and Provenzano entered into several related contracts.  The Asset Purchase Agreement provides that Maine law will govern.  Exhibit 75 at 15.10.  The Employment Agreement does not contain a choice of law provision.

2.    Under both Maine and California law, when several documents are executed together for one transaction, the documents are construed together as one instrument.  Handy Boat Serv., Inc. v. Prof'l Servs., Inc., 711 A.2d 1306, 1308 (Me. 1998); Margolis v. Margolis, 115 Cal. App. 2d 131, 136 (1952).  Under both Maine and California law, to prevail on a breach of contract claim, the plaintiff must show (1) a valid contract existed, (2) performance, or excuse of performance, by the plaintiff, (3) a breach of obligation by the defendant, and (4) damages.  Jenkins, Inc. v. Walsh Bros., 776 A.2d 1229, 1234-35 (Me. 2001); Wall Street Network, Ltd. v. N.Y. Times Co., 164 Cal. App. 4th 1171, 1178 (2008).  To excuse performance by one party to a contract, the breach by the other party must be material.  Jenkins, 776 A.2d at 1234; Brown v. Grimes, 192 Cal. App. 4th 265, 277 (2011).

3.    Provenzano's failure to deliver what she promised to deliver pursuant to the Asset Purchase Agreement is a breach.  C.N. Brown Co. v. Gillen, 569 A.2d 1206, 1214 (Me. 1990); Woodard v. Glenwood Lumber Co., 171 Cal. 513, 522-23 (1915); 1 Witkin Summary of California Law: Contracts § 849 (10th ed. 2005).  It also constitutes a failure of consideration.  Augusta Bank v. Hablet, 35 Me. 491, 495-96 (1853); Madera Canal & Irrigation Co. v. K. Arakelian, Inc., 103 Cal. App. 592, 597 (1930); 1 Witkin Summary § 813.

4.    Provenzano failed to perform material obligations – for example, she failed to deliver all rights and domain names to presat.com, used for her own purposes trademarks and business information that she had conveyed to Card Tech for its exclusive use, failed to report sales, provided inaccurate information of sales

and shipments, and did not devote her exclusive attention to Card Tech's business. Provenzano was not excused from performance of her contractual obligations.

5.      Conveying the trademarks, trade names, trade dress, and goodwill of a business and then using them again in derogation of the assets conveyed constitutes a material breach of contract, as well as trademark infringement.  3 McCarthy on Trademarks and Unfair Competition § 18:15 (4th ed. 1994).

6.      Provenzano's material breaches excused further performance of the Asset Purchase Agreement by Card Tech.  Augusta Bank, 35 Me. at 495-96; Brown, 192 Cal. App. 4th at 277 (citing 1 Witkin Summary §§ 813, 814).  No further sums are due from Card Tech to Provenzano.

7.      As a result of Provenzano's failure to convey all rights and domain names to presat.com, Card Tech has had to develop its own website.  Card Tech has suffered damages in the amount of $4000 spent to create the website, and will likely incur $2000 in additional damages.  Defendants are liable to Card Tech in the amount of $6000.

*Claim 2*:  Fraudulent Inducement

8.      The elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) scienter, (3) intent to induce reliance, (4) justifiable reliance, and (5) damages.  Lazar v. Superior Court, 12 Cal. 4th 631, 638 (1996).  A promise made with no intent to perform constitutes a misrepresentation that will give rise to a fraud claim.  Cal. Civ. Code § 1710(4); Lazar, 12 Cal. 4th at 638.

9.      While there is evidence that Provenzano never intended to convey exclusive ownership of at least the presat.com domain name and website, the Court finds that Card Tech has not shown fraudulent inducement of the Asset Purchase Agreement by a preponderance of the evidence.  Provenzano knew that she did not have the rights she claimed to have, but she apparently believed Card Tech would have exclusive access to the website nevertheless.

10.      There is little or no evidence that – at the time she entered into the

1  Employment Agreement – Provenzano did not intend to be an employee and work

2  exclusively for Card Tech for five years.

3       11.    The Court finds in favor of Provenzano as to the fraudulent

4  inducement claim.

5  *Claim 4*:  Unfair Competition – trade dress

6       12.    Trade dress is the total image of a product and may include features

7  such as size, shape, color or color combinations, texture, or graphics.  Two Pesos v.

8  Taco Cabana, 505 U.S. 763, 765 n.1 (1992); Clicks Billiards, Inc. v. Sixshooters,

9  Inc., 251 F.3d 1252, 1257 (9th Cir. 2001).  To prevail on a trade dress infringement

10  claim, the plaintiff must establish (1) that its trade dress is nonfunctional, (2) that it

11  is inherently distinctive or has acquired a secondary meaning, and (3) that the

12  defendant's conduct creates a likelihood of confusion.  Clicks Billiards, 251 F.3d at

13  1258.

14       13.    Trade dress is considered as a whole.  Elements that are separately

15  unprotectable may be protected together as part of a trade dress.  See Bristol-Myers

16  Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1042 (2d Cir. 1992) ("In

17  examining trade dress the focus is on the entire look of the product or packaging.

18  Individual aspects of a trade dress may be eligible for trademark protection in their

19  own right, but in an action for trade dress infringement each aspect should be

20  viewed in relation to the entire trade dress.").

21       14.    For example, "[a] restaurateur cannot prevent others from using any

22  particular color or feature, but can protect a combination of visual elements 'that,

23  taken together, . . . may create a distinctive visual impression.'" Fuddruckers, Inc.

24  v. Doc's B.R. Others, Inc., 826 F.2d 837, 842 (9th Cir. 1987) (quoting Falcon Rice

25  Mill, Inc. v. Cmty. Rice Mill, Inc., 725 F.2d 336, 346 (5th Cir. 1984)).

26       The overall appearance of the Card Tech trade dress is not functional

27       15.    To be protectable, trade dress must be nonfunctional.  Clicks Billiards,

28

251 F.3d at 1258.  Here, the trade dress is the packaging, not the product itself.  To the extent product trade dress is treated differently from packaging trade dress, authorities dealing with product trade dress may not be applicable.

16.     "A product feature is functional and cannot serve as a trademark if the product feature is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if the exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage."  <u>Clicks Billiards</u>, 251 F.3d at 1258.

17.     Trade dress is examined as a whole to determine its functionality; functional elements that are not protectable separately can be protected together as part of a trade dress.  <u>Clicks Billiards</u>, 251 F.3d at 1259; <u>Kendall–Jackson Winery Ltd. v. E. & J. Gallo Winery</u>, 150 F.3d 1042, 1050 (9th Cir. 1998); <u>Fuddruckers</u>, 826 F.2d at 842-43.

18.     Courts consider several factors in determining the functionality of trade dress:  "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture."  <u>Clicks Billiards</u>, 251 F.3d at 1260.  The functionality requirement is designed "to protect advances in functional design from being monopolized."  <u>LeSportsac, Inc. v. K Mart Corp.</u>, 754 F.2d 71, 76 (2d Cir. 1985) (citation omitted).  Trade dress likely is not functional where protection would leave many alternatives to competitors that would not prove confusingly similar to the protected trade dress.  <u>Clicks Billiards</u>, 251 F.3d at 1261.

19.     The overall appearance created by a combination of colors and design features is not functional.  <u>See, e.g.</u>, <u>Fuddruckers</u>, 826 F.2d at 842 (stating that a "combinational of visual elements" in the design of a restaurant that, "taken together may create a distinctive visual impression" was not functional (alteration,

1    citation, and internal quotation marks omitted)); Lisa Frank, Inc. v. Impact Int'l,

2    Inc., 799 F. Supp. 980, 986-87 (D. Ariz. 1992) (concluding that the "overall visual

3    appearance" of novelty stationery resulting from a combination of colors, graphics,

4    and aesthetic features was not functional).  One court has specifically reached this

5    conclusion in the context of Internet websites.  See Conf. Archives, Inc. v. Sound

6    Images, Inc., 2010 WL 1626072, at *17 (W.D. Pa. Mar. 31, 2010) ("Concerns

7    about . . . monopolization are minimized in the context of web sites," because there

8    are "so many other equally efficient ways to arrange a site. . . .  As long as there are

9    alternate ways to design a web site, beyond the arrangement protected by the trade

10   dress, the site's interface should not be considered functional." (citation and internal

11   quotation marks omitted)).

12       20.    The overall appearance of Card Tech's website and packaging are not

13   functional.  Providing a product name, instructions for use, depictions of the

14   product, and how-to illustrations are arguably functional features because they yield

15   a utilitarian advantage, and because preventing a competitor from using these

16   features would hamper competition and put competitors at a non-reputation-related

17   disadvantage.  Click Billiards, 251 F.3d at 1258-60.  However, trade dress is to be

18   viewed as a whole.  The particular arrangement of these features, along with the

19   colors and shapes on Card Tech's packaging, is not functional.  Card Tech

20   submitted examples of its trade dress.  That was sufficient evidence for the Court to

21   perform the functionality analysis.

22       Card Tech's trade dress is inherently distinctive

23       21.    To qualify for protection, trade dress must either be inherently

24   distinctive or have acquired secondary meaning.  Two Pesos, 505 U.S. at 769.  If

25   trade dress is inherently distinctive, the plaintiff need not show secondary meaning.

26   Id. at 771-73.  Card Tech's trade dress is inherently distinctive.

27       22.    In considering whether a mark is inherently distinctive, courts consider

28   "whether it is a 'common' basic shape or design, whether it is unique or unusual in

a particular field, and whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods . . . ." Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp., 716 F.2d 854, 858 (11th Cir. 1983) (alterations omitted) (quoting Seabrook Foods, Inc. v. Bar-Well Foods Ltd., 568 F.2d 1342, 1344 (C.C.P.A. 1977)).

23.    Card Tech's trade dress is unique (aside from Provenzano's copying). A unique combination of common aesthetic features can be distinctive.  For example, "[t]he combination of particular hues of [two] colors, arranged in certain geometric designs, presented in conjunction with a particular style of printing" on a chemical label that creates "a distinctive visual impression" is inherently distinctive.  Chevron Chem. Co. v. Voluntary Purchasing Grps., Inc., 659 F.2d 695, 703 (5th Cir. 1981); see also AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1536 (11th Cir. 1986) (concluding that the Klondike bar trade dress "with its square size, bright coloring, pebbled texture, polar bear and sunburst images, and distinctive style of printing" was inherently distinctive); Lisa Frank, 799 F. Supp. at 989 (concluding that the "use of bold colors and a graduated color-fade with knock-out graphics and other artwork" created a "distinctive visual impression" in novelty stationery and was inherently distinctive).  Although certain elements of Card Tech's trade dress may be commonly available, its particular combination of elements is not a mere refinement of well-known forms of ornamentation commonly used by others in the relevant industry.

There is a likelihood of confusion

24.    Likelihood of confusion is the touchstone for trade dress infringement. "Likelihood of confusion exists when customers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." Clicks Billiards, 251 F.3d at 1265.  The factual elements to be considered for likelihood of confusion

1  include the strength of the mark, proximity of goods, similarity of the marks,

2  evidence of actual confusion, marketing channels used, degree of care exercised by

3  purchasers, defendant's intent in adopting the mark, and likelihood of expansion of

4  product lines.  <u>AMF, Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 348-49 (9th Cir. 1979),

5  <u>abrogated on other grounds by</u> <u>Mattel Inc. v. Walking Mt. Prods.</u>, 353 F.3d 792,

6  810 n.19 (9th Cir. 2003).  These factors are not a "rote checklist."  <u>Network</u>

7  <u>Automation, Inc. v. Advanced Sys. Concepts, Inc.</u>, 638 F.3d 1137, 1145 (9th Cir.

8  2011).

9       25.    In this case, Defendants' trade dress is virtually identical to Card

10  Tech's, the goods are the same, and the marketing channel (i.e., the Internet) is the

11  same.  The use of an identical advertisement of a nearly identical product with a

12  nearly identical name is likely to cause consumer confusion.  Docket No. 82, Order

13  Granting Application for Preliminary Injunction at 11.

14       26.    Although evidence of actual confusion is a factor in determining

15  likelihood of confusion, absence of such evidence is not dispositive.  <u>See, e.g.</u>,

16  <u>Eclipse Assocs., Ltd. v. Data Gen. Corp.</u>, 894 F.2d 1114, 1118 (9th Cir. 1990)

17  (citing <u>Sleekcraft</u>, 599 F.2d at 353).  A plaintiff need not prove actual confusion to

18  prevail on a trade dress infringement claim.  <u>See</u> 15 U.S.C. § 1125(a)(1)(A); <u>Clicks</u>

19  <u>Billiards</u>, 251 F.3d at 1258.

20       27.    Deliberate copying of a similar mark creates a presumption of intent to

21  deceive.  <u>Interstellar Starship Servs., Ltd. v. Epix, Inc.</u>, 184 F.3d 1107, 1111 (9th

22  Cir. 1999); <u>Official Airline Guides v. Goss</u>, 6 F.3d 1385, 1394 (9th Cir. 1993).

23  Intent to deceive is strong evidence of likely confusion.  <u>Interstellar Starship Servs.</u>,

24  184 F.3d at 1111.

25       28.    Bad faith is not required for deliberate copying to be strong evidence

26  of likely confusion.  <u>See</u> <u>Sleekcraft</u>, 599 F. 2d at 354 ("When the alleged infringer

27  knowingly adopts a mark similar to another's, reviewing courts presume that the

28  defendant can accomplish his purpose: that is, that the public will be deceived.

1  Good faith is less probative of the likelihood of confusion, yet may be given

2  considerable weight in fashioning a remedy." (citations omitted)).

3      29.    Provenzano's use of Card Tech's trade dress was deliberate.  The

4  obvious similarity of the trade dress, Provenzano's knowledge of the trade dress

5  and that it belonged to Card Tech, and Provenzano's deliberate and unmitigated

6  copying of the presat.com website establishes deliberate copying.  Provenzano

7  deliberately sought and received a substantially identical website and packaging

8  that is identical in overall appearance and impression.  Provenzano chose to use

9  Card Tech's trade dress because it was less expensive for her.  To the extent that

10 Provenzano claimed that she was unaware that her conduct was wrongful, the Court

11 finds her testimony is not credible.  Provenzano's conduct is strong evidence of

12 likely confusion.

13     30.    "When the goods produced by the infringer compete for sales with

14 those of the trademark owner, infringement usually will be found if the marks are

15 sufficiently similar that confusion can be expected."  Sleekcraft, 599 F.2d at 348;

16 see also Fin. Express LLC v. Nowcom Corp., 564 F. Supp. 2d 1160, 1175 (C.D.

17 Cal. 2008).  Consumer confusion is likely here because the similar trade dress is

18 used by Provenzano to sell products that are virtually identical to Card Tech

19 products.  Cf. Faegre & Benson LLP v. Prudy, 367 F. Supp. 2d 1238, 1244-45 (D.

20 Minn. 2005) (finding a low likelihood of confusion where similar websites were

21 used for completely distinct purposes, and one of the websites included a disclaimer

22 on each page stating that it was a parody of the other site).  Where the marks are the

23 same and the products are the same, the strength of the mark is of diminished

24 importance.  Brookfield Commc'ns, Inc. v. W. Coast Entm't, 174 F.3d 1036, 1058-

25 59 (9th Cir. 1999).

26     31.    Where products are relatively inexpensive, there is a higher likelihood

27 that consumers will be confused because they are likely to use less care while

28 shopping.  Classic Foods Int'l Corp. v. Kettle Foods, Inc., 2006 WL 5187497, at

*14 (C.D. Cal. Mar. 2, 2006).  Because the relevant products here are inexpensive, customers are more likely to be confused by Defendants' nearly identical trade dress.  Moreover, Provenzano took affirmative steps to conceal from customers that she had sold her business to Card Tech.  Thus, any investigation by the customer would be unlikely to eliminate confusion.

Injunctive relief is warranted

32.     Injunctive relief is appropriate where there is no adequate remedy at law.  Richfield Oil Corp. v. United States, 207 F.2d 864, 870 (9th Cir. 1953).

33.     Legal remedies are generally inadequate in the context of trademark infringement.  See, e.g., Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."); 5 McCarthy § 30:2 ("It is difficult to imagine an unfair competition case where damages are adequate to remedy the problem of defendant's continued acts.").  This is because the likelihood of confusion generated by an infringing mark generally threatens the plaintiff's goodwill and reputation.  Paulsson Geophysical Servs. v. Sigmar, 529 F.3d 303, 313 (5th Cir. 2008) (noting that the defendant's infringement causes the plaintiff to "los[e] control of the quality of the technology that was being associated with its mark").  Loss of goodwill and damage to reputation is "not readily measurable," and loss of sales is "notoriously difficult to calculate," making money damages an inadequate remedy.  Omega Importing Corp. v. Petri-Kine Camera Co., 451 F.2d 1190, 1195 (2d Cir. 1971).

34.     Causation is not an element of a trade dress infringement claim; Card Tech need not prove that *any* sales in fact resulted from actual confusion.  See 15 U.S.C. § 1125(a)(1)(A); Sleekcraft, 599 F.2d at 352-53 (a plaintiff need only prove that confusion is *likely*).  Where a plaintiff seeks injunctive relief, as opposed to actual damages, actual loss need not be proven.  See 15 U.S.C. § 1125(a)(1)(A);

1    Safeway Stores, Inc. v. Rudner, 246 F.2d 826, 829 (9th Cir. 1957).

2    *Claim 5*:  Unfair Competition – trademark

3            35.    Trademark rights arise from use.  CreAgri, Inc. v. USANA Health

4    Sciences, Inc., 474 F.3d 626, 630 (9th Cir. 2007).  Each and all of the marks at

5    issue were in use by Provenzano prior to March 2010.  These marks were assets

6    conveyed to Card Tech by the Asset Purchase Agreement.  Ms. Provenzano

7    individually was a signatory to that conveyance.

8            36.    The trademark PRESAT is registered with the U.S. Patent and

9    Trademark Office (Registration Number 3443482).  That registration includes a

10   Three Drop symbol used with the word PRESAT.

11           37.    The PRESAT mark is presumptively valid and protectable.  15 U.S.C.

12   § 1057(b); Quiksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 755 (9th Cir. 2006).

13   Provenzano has not claimed that the PRESAT mark is not protectable.

14           38.    DIAMOND TECHNOLOGY, CLEAN SWAB, EASY WIPES, EASY

15   CLEAN CARD, EASY SWAB, and the slogan "Results Are Obvious" are

16   unregistered trademarks used by Card Tech.  Unregistered marks are subject to the

17   same standard as registered marks.  Brookfield Commn'cs, 174 F.3d at 1046.

18           There is a likelihood of confusion

19           39.    Likelihood of confusion is the touchstone for trade dress infringement.

20   "Likelihood of confusion exists when customers viewing the mark would probably

21   assume that the product or service it represents is associated with the source of a

22   different product or service identified by a similar mark." Clicks Billiards, 251

23   F.3d at 1265.  The factual elements to be considered for likelihood of confusion

24   include the strength of the mark, proximity of goods, similarity of the marks,

25   evidence of actual confusion, marketing channels used, degree of care exercised by

26   purchasers, defendant's intent in adopting the mark, and likelihood of expansion of

27   product lines.  Sleekcraft, 599 F.2d at 348-49.  These factors are not a "rote

28   checklist."  Network Automation, 638 F.3d at 1145.

40.     Although evidence of actual confusion is a factor in determining likelihood of confusion, absence of such evidence is not dispositive.  See, e.g., Eclipse Assocs., 894 F.2d at 1118 (citing Sleekcraft, 599 F.2d at 353).  A plaintiff need not prove actual confusion to prevail on a trade dress infringement claim.  See 15 U.S.C. § 1125(a)(1)(A); Clicks Billiards, 251 F.3d at 1258.

41.     Trademarks need not be identical in order to infringe; it is enough if they are confusingly similar.  See, e.g., Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19 (1900); Wash. Speakers Bureau Inc. v. Leading Authorities Inc., 33 F. Supp. 2d 488 (E.D. VA. 1999) (considering domain names), aff'd 217 F.3d 843 (4th Cir. 2000).  Conflicting marks are to be compared with respect to sight, sound, and meaning.  Sleekcraft, 599 F.2d at 351.

42.     After this action was commenced, Provenzano changed her use of the DIAMOND TECHNOLOGY mark to use of DIAMOND ICE TECHNOLOGY.  DIAMOND ICE TECHNOLOGY is confusingly similar to Card Tech's mark DIAMOND TECHNOLOGY.  See, e.g., Con Agra v. Hormel & Co., 990 F.2d 368 (8th Cir. 1998) (concluding, in the context of the facts of the case, that "Healthy Choice" and "Health Selections" were confusingly similar marks); Mobil Oil Corp. v. Teagarden, 190 U.S.P.Q. 560 (T.T.A.B. 1976) (concluding, in the context of the facts of the case, that "Mobil Man" and "Mobil Muffler Man" were confusingly similar marks); see also 4 McCarthy § 23.29.

43.     After being ordered to cease using any mark confusingly similar to DIAMOND TECHNOLOGY, Provenzano replaced the word DIAMOND with the image of a Diamond.  A picture and a word may be confusingly similar.  See, e.g., Beer Nuts, Inc. v. King Nut Co., 477 F.2d 326 (6th Cir. 1973) (concluding that use of the word NUTS as part of a mark with a picture of stein of beer infringed on the word mark BEER NUTS); Arrow-Hart, Inc. v. Yazaki Corp., 169 U.S.P.Q. 249 (T.T.A.B. 1971) (concluding that an ARROW and picture of an arrow were confusingly similar to the registered mark ARROW); Jockey Int'l, Inc. v. Butler, 3

1    U.S.P.Q.2d 1607 (T.T.A.B. 1987) (concluding that a picture of a jockey riding a

2    horse was confusingly similar to the word mark JOCKEY).  The mark using the

3    picture of a diamond is confusingly similar to the DIAMOND TECHNOLOGY

4    mark.

5         44.    Provenzano changed her use of PRESAT to PREsaturated.  Moreover,

6    she continued to use the rippled water image from the Card Tech trade dress with

7    the PREsaturated mark.  This mark is confusingly similar to the PRESAT mark.

8         45.    In this case, Defendants' marks are very similar to Card Tech's, the

9    goods are the same, and the marketing channel (i.e., the Internet) is the same.  The

10   use of an identical advertisement of a nearly identical product with a nearly

11   identical name is likely to cause consumer confusion.  Docket No. 82, Order

12   Granting Application for Preliminary Injunction at 11.  "When the goods produced

13   by the infringer compete for sales with those of the trademark owner, infringement

14   usually will be found if the marks are sufficiently similar that confusion can be

15   expected."  Sleekcraft, 599 F.2d at 348; see also Fin. Express LLC, 564 F. Supp. 2d

16   at 1175.  Consumer confusion is likely here because the similar marks were used by

17   Provenzano to sell products that are virtually identical to Card Tech products.  Cf.

18   Faegre & Benson LLP, 367 F. Supp. 2d at 1244-45.

19        46.    Where the marks are the same and the products are the same, the

20   strength of the mark is of diminished importance.  Brookfield Commc'ns, 174 F.3d

21   at 1058-59.

22        47.    Deliberate copying of a similar mark creates a presumption of intent to

23   deceive, which is strong evidence of likely confusion.  Interstellar Starship Servs.,

24   184 F.3d at 1111; Official Airline Guides, 6 F.3d at 1394.  Deliberate copying,

25   even absent bad faith, is evidence of likely confusion.  See Sleekcraft, 599 F. 2d at

26   354.

27        48.    Provenzano's use of these marks was deliberate – she knew that she

28   had conveyed the marks to Card Tech, and she used identical or nearly identical

marks.  She chose to use the marks because it was less expensive for her.  In addition, Provenzano's series of minor, incremental changes to the similar marks evidence the intent to deceive, and the intent to continue to take advantage of Card Tech's goodwill.  Provenzano's conduct is strong evidence of likely confusion.

49.     Where products are relatively inexpensive, there is a higher likelihood that consumers will be confused because they are likely to use less care while shopping.  <u>Classic Foods Int'l Corp.</u>, 2006 WL 5187497, at *14.  Because the relevant products here are inexpensive, customers are more likely to be confused by Defendants' nearly identical trade dress.  Moreover, Provenzano took affirmative efforts to conceal from customers that she had sold her business to Card Tech would make any investigation by a customer unlikely to eliminate confusion.

<u>Injunctive relief is warranted</u>

50.     Injunctive relief is appropriate where there is no adequate remedy at law.  <u>Richfield Oil Corp.</u>, 207 F.2d at 870.

51.     Legal remedies are generally inadequate in the context of trademark infringement.  <u>See, e.g.</u>, <u>Century 21</u>, 846 F.2d at 1180; 5 <u>McCarthy</u> § 30:2.  This is because the likelihood of confusion generated by an infringing mark generally threatens the plaintiff's goodwill and reputation.  <u>Paulsson Geophysical Servs.</u>, 529 F.3d at 313.  Loss of goodwill and damage to reputation is "not readily measurable," and loss of sales is "notoriously difficult to calculate," making money damages an inadequate remedy.  <u>Omega Importing Corp.</u>, 451 F.2d at 1195.

52.     Causation is not an element of an action for trademark infringement; Card Tech need not prove that *any* sales in fact resulted from actual confusion.  <u>See</u> 15 U.S.C. § 1125(a)(1)(A); <u>Sleekcraft</u>, 599 F.2d at 352-53 (a plaintiff need only prove that confusion is *likely*).  Where a plaintiff seeks injunctive relief, as opposed to actual damages, actual loss need not be proven.  <u>See</u> 15 U.S.C. § 1125(a)(1)(A); <u>Safeway Stores</u>, 246 F.2d at 829.

*Claim 6*:  <u>Unfair Competition – state law</u>

53.     The basis for Card Tech's claim under California's unfair competition law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.*, is identical to its federal trademark and trade dress infringement claims.  UCL claims are "substantially congruent" to trademark infringement claims under the Lanham Act.  <u>Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.</u>, 944 F.2d 1446, 1457 (9th Cir. 1991) (citation omitted).

54.     However, California's UCL is broader than the Lanham Act.  The UCL "does not proscribe specific practices," but rather "defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.'"  <u>Cel-Tech Commn'cs, Inc. v. Los Angeles Cellular Telephone Co.</u>, 20 Cal. 4th 163, 180 (1999) (quoting Cal. Bus. & Prof. Code § 17200).  "[T]he Legislature . . . intended by [the UCL's] sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur."  <u>Id.</u> at 181 (alterations in original) (citation omitted); <u>see also</u> <u>Bank of the West v. Superior Court</u>, 2 Cal. 4th 1254, 1266-67 (1992) ("In drafting the act, the Legislature deliberately traded the attributes of tort law for speed and administrative simplicity.").  "In permitting the restraining of all 'unfair' business practices, [the UCL] undeniably establishes only a wide standard to guide courts of equity; . . . given the creative nature of the scheming mind, the Legislature evidently concluded that a less inclusive standard would not be adequate."  <u>Cel-Tech</u>, 20 Cal. 4th at 181 (citation omitted).

55.     Courts have consistently interpreted the language of § 17200 broadly.  <u>See, e.g.</u>, <u>Prata v. Superior Court</u>, 91 Cal. App. 4th 1128, 1137 (2001).   The statute imposes strict liability – i.e., a defendant may be liable even if she did not intend to injure anyone.  <u>Id.</u>

56.     The UCL "governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose the preservation of fair business competition.'"  <u>Cel-Tech</u>, 20 Cal. 4th at 180.

57.     Section 17200 defines unfair competition to include any "unfair" business practice.  The California Supreme Court has specifically defined "unfair" in the context of competitor actions, in which the plaintiff claims that it "suffered injury from a direct competitor's 'unfair' act or practice." <u>Cel-Tech</u>, 20 Cal. 4th at 187.  In the competitor context, "unfair" refers to "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." <u>Id.</u>  The policy should be "tethered to a constitutional or statutory provision or a regulation carrying out statutory policy." <u>Id.</u> at 185 (citation omitted).  In the context of consumer actions – or actions by competitors "alleging other kinds of violations of the [UCL]," <u>id.</u> at 187 n.12 – a different standard applies.  Many California courts apply the rule that a business practice is "unfair" if "(1) the consumer injury is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by consumers themselves." <u>Klein v. Chevron U.S.A., Inc.</u>, 202 Cal. App. 4th 1342, 1376 (2012) (citing <u>Camacho v. Auto. Club of S. Cal.</u>, 142 Cal. App. 4th 1394, 1403 (2006) (distinguishing <u>Cel-Tech</u>)).  Card Tech may not sue under the UCL to vindicate the rights of consumers.  <u>See</u> Cal. Bus. & Prof. Code § 17204 (stating that a UCL claim may be brought "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition").

58.     Provenzano's use of infringing trademarks and trade dress, as well as her efforts to conceal the fact that she had sold her business to Card Tech, clearly "violates the policy or spirit of [the anti-trust] laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." <u>Cel-Tech</u>, 20 Cal. 4th at 187.  The purpose underlying California's Unfair Practices Act, Cal. Bus. & Prof. Code § 17000 *et seq.*, California's anti-trust law, is "to foster and encourage competition, by

1    prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory

2    practices by which fair and honest competition is destroyed or prevented." Cal.

3    Bus. & Prof. Code § 17001.  Provenzano's conduct clearly destroyed or prevented

4    fair and honest competition by misleading the public as to the true source of her

5    products, and by appropriating sales of Card Tech's goods as her own, thus denying

6    Card Tech the ability to compete in the market.  This conduct qualifies as "unfair"

7    under the UCL.  See Cel-Tech, 20 Cal. 4th at 189 (concluding that practices

8    violating § 17001 qualify as "unfair" under the UCL).  Card Tech was harmed by

9    this conduct, as evidenced by the decline in its sales.  See Cal. Bus. & Prof. Code §

10   17204.

11        59.    A court may enjoin any practice that constitutes unfair competition

12   under the UCL.  Cal. Bus. & Prof. Code § 17203.

13   *Claim 9:*      Fraudulent Concealment

14        60.    The elements of a fraudulent concealment claim are: "(1) the defendant

15   must have concealed or suppressed a material fact, (2) the defendant must have

16   been under a duty to disclose the fact to the plaintiff, (3) the defendant must have

17   intentionally concealed or suppressed the fact with the intent to defraud the

18   plaintiff, (4) the plaintiff must have been unaware of the fact and would not have

19   acted as he did if he had known of the concealed or suppressed fact, and (5) as a

20   result of the concealment or suppression of the fact, the plaintiff must have

21   sustained damage." Jones v. ConocoPhillips Co., 198 Cal. App. 4th 1187, 1198

22   (2011) (citation omitted).  The plaintiff bears the burden of proof by a

23   preponderance of the evidence.  Liodas v. Sahadi, 19 Cal. 3d 278, 291 (1977);

24   Sierra Nat'l Bank v. Brown, 18 Cal. App. 3d 98, 105 (1971); see also Cal. Evid.

25   Code § 115.

26        61.    Provenzano was an officer and an employee of Card Tech.  As either,

27   she owed a fiduciary duty to Card Tech.  Diodes, Inc. v. Franzen, 260 Cal. App. 2d

28   244, 249 (1968).

62.     Provenzano concealed at least the following material facts from Card Tech: that she did not own the presat.com domain name, purchases of inventory used by Card Tech for her own account, orders from customers, shipments via her UPS '046 account not known to Card Tech and for which she did not provide reports, deposits of payments intended for Card Tech into her '207 bank account that were not authorized by Card Tech and for which she never provided any statements, the creation, and/or the preparation to create, new websites.  She concealed all these things knowingly and intentionally.  Provenzano understood that she had an obligation to keep Card Tech informed of her business activities.

63.     Card Tech did not know of those activities and could not reasonably have discovered them without an investigation.

64.     Card Tech has established by a preponderance of the evidence that Provenzano concealed the deposits made to the '207 account with the intent to defraud Card Tech.  Provenzano transferred money from her '207 account into the Card Tech-authorized '277 account in March and April that far exceeded the amounts transferred in any prior months.  The great increase in transfers combined with the questions that Card Tech was asking is evidence that Provenzano made the transfers only when she believed that Card Tech would find out about her diversion if the money was not transferred to the '277 account.

65.     The $20,000 that Provenzano admits she failed to transfer to Card Tech's account constitutes damages.

*Claim 11:*     Conversion

66.     The "essential elements of a conversion action . . . are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages."  Shopoff & Cavallo LLP v. Hyon, 167 Cal. App. 4th 1489, 1507 (2008) (internal quotation marks and citation omitted).  Any act of dominion wrongfully exerted over the personal property of another is conversion.  Plummer v.

Day/Eisenberg, LLP, 184 Cal. App. 4th 38, 50 (2010).  It is not necessary for conversion that there be a manual taking of the property; any assumption of control or ownership over the property, or application of the property to the alleged converter's own use, is conversion.  Id.; Shopoff & Cavallo, 167 Cal. App. 4th at 1507.  Money can be the subject of a cause of action for conversion if there is a "specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment."  PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, 150 Cal. App. 4th 384, 395 (2007).

67.     Provenzano accepted a fixed sum of money – approximately $20,000 – for payment of Card Tech goods shipped to fill an order.

68.     Provenzano does not dispute that she exercised and continues to exercise dominion over at least $20,000 of Card Tech's money.

69.     Provenzano's exercise of dominion is wrongful.  She is not entitled to retain the funds even if Card Tech owed her money under California Labor Code §§ 203 and 2802.  Rights to penalties under § 203 do not vest until the employee brings an enforcement action.  Pineda v. Bank of Am., N.A., 50 Cal. 4th 1389, 1402 (2010); Murphy v. Kenneth Cole Prods., Inc., 40 Cal. 4th 1094, 1108 (2007).  And even if the funds owed under § 2802 constitute wages in which Provenzano has a vested interest, California law suggests that she must file either a judicial action or an administrative action to recover the funds.  Reynolds v. Bement, 36 Cal. 4th 1075, 1084 (2005), abrogated on other grounds by Martinez v. Combs, 49 Cal. 4th 35, 50 n.12 (2010).  Defendants provide no support for the claim that Provenzano could rightfully retain the funds.

70.     As an officer and an employee of Card Tech, Provenzano was an agent of Card Tech.  An agent "is ordinarily liable for converting the funds of [her] principal when [she] refuses to account for them upon proper demand. While it is true that money cannot be the subject of an action for conversion

1   unless a specific sum capable of identification is involved, it is not necessary

2   that each coin or bill be earmarked.  When an agent is required to turn over to

3   [her] principal a definite sum received by [her] on [her] principal's account,

4   the remedy of conversion is proper."   <u>Fischer v. Machado</u>, 50 Cal. App. 4th

5   1069, 1072 (1996).

6       71.   Initially the sum over which Provenzano exercised dominion without

7   authority (deposits to the '207 account not promptly transferred to the '277

8   account) was considerably in excess of $20,000.  Eventually, after some months

9   and after Card Tech began asking probing questions for information, Provenzano

10   paid over all except at least $20,000.  Provenzano is liable to Card Tech in that

11   amount.

12   *Claim 12:*   <u>Intentional interference with prospective economic advantage</u>

13       72.   The elements of the tort of intentional interference with prospective

14   economic advantage are: "(1) an economic relationship between the plaintiff and a

15   third party, with the probability of future economic benefit to the plaintiff; (2) the

16   defendant's knowledge of the relationship; (3) an intentional act by the defendant,

17   designed to disrupt the relationship; (4) actual disruption of the relationship; and (5)

18   economic harm to the plaintiff proximately caused by the defendant's wrongful act,

19   including an intentional act by the defendant that is designed to disrupt the

20   relationship between the plaintiff and a third party."   <u>Edwards v. Arthur Andersen</u>

21   <u>LLP</u>, 44 Cal. 4th 937, 944 (2008).  "The plaintiff must also prove that the

22   interference was wrongful, independent of its interfering character."   <u>Id.</u> (citing

23   <u>Della Penna v. Toyota Motor Sales, U.S.A., Inc.</u>, 11 Cal. 4th 376, 392-93 (1985)).

24       73.   Provenzano knew Card Tech's customers – she had conveyed her

25   rights to the customer list and their sales records – and she was selling Card Tech

26   products to those customers.  She also knew there was a probability that the

27   customers would continue dealing with Card Tech.  Provenzano intended to disrupt

28   Card Tech's business relationship and deal with the customers herself.

74.     Soliciting business in competition is not wrongful unless by action that is wrongful in and of itself.  <u>Reeves v. Hanlon</u>, 33 Cal. 4th 1140, 1150 (2004); <u>Della Penna</u>, 11 Cal. 4th at 392-93.  Using business information that had been conveyed to Card Tech is wrongful in and of itself.  <u>See, e.g.</u>, <u>Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg</u>, 216 Cal. App. 3d 1139, 1154 (1989) (stating that use of confidential information, or breach of fiduciary duty, is wrongful in and of itself).  Infringement of Card Tech's trade dress and trademarks is wrongful in and of itself.

75.     However, Card Tech has provided no evidence that it lost a single sale or lost a single customer as a result of Provenzano's wrongful conduct.  Nor does it provide evidence of any damage at all.  Therefore, Card Tech cannot prevail on this claim.  <u>See, e.g.</u>, <u>Reeves</u>, 33 Cal. 4th at 1146-48 (affirming a judgment for the plaintiffs where former employees of a firm persuaded nine employees to leave, causing the firm to spend more than $20,000 for employee recruitment to mitigate damages, and solicited the business of the firm's clients, causing 144 of them to fail to pay fees they owed the firm); <u>Little v. Amber Hotel Co.</u>, 202 Cal. App. 4th 280, 305 (2011) (affirming the award of lost profits where the evidence showed that the defendant's misconduct ended the plaintiff's profitable relationship with identified individuals); <u>Guillory v. Godfrey</u>, 134 Cal. App. 2d 628, 632 (1955) (rejecting the claim that a damage award was not supported by evidence of lost profits because the plaintiff had provided evidence of medical expenses resulting from physical illness resulting from the defendants' conduct).

*Claim 13*:     <u>Defamation</u>

76.     Libel is a form of defamation.  <u>See</u> Cal. Civ. Code § 44(a).  Libel is "a false and unprivileged publication . . .  which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."  <u>Id.</u> § 45.  "A corporation can be libeled by statements which injure its business reputation."  <u>Barnes-Hind,</u>

Inc. v. Superior Court, 181 Cal. App. 3d 377, 381 (1986).

77.    Libel that is "defamatory of the plaintiff without the necessity of explanatory matter" is libel per se.  Barnes-Hind, 181 Cal. App. 3d at 382.  Where a statement is libel per se, damage to reputation is presumed, and the plaintiff need not show actual damage.

78.    Provenzano's statement that Card Tech "swindled" her out of her business is libel per se.  The statement is false.  There is no evidence that Card Tech swindled her out of her business or was trying to turn vendors against her.  Not continuing to pay on a note when there is a dispute whether payment continues to be due is not "swindling."

79.    A false accusation of "swindling" is an accusation of a crime or of fraud.  People v. Berry, 191 Cal. 109, 122 (1923); Black's Law Dictionary (9th ed. 2009).  Such a statement could have a tendency to injure Card Tech in its occupation and to discourage others from associating or dealing with it.

80.    However, Card Tech has not established that any recipient of the emails knew Provenzano was referring to Card Tech or Farrar.  Therefore, Card Tech cannot prevail on this claim.

**Card Tech is entitled to Provenzano's "infringer profits"**

81.    Card Tech is entitled to Provenzano's "infringer profits" on sales up to November 7, 2011, the date the preliminary injunction issued – profit from sales after November 7 are being awarded pursuant to the Contempt Order.  In this case, that profit is Provenzano's gross receipts, because she did not produce any admissible evidence of deductible costs.

82.    An award of infringer profits in a trademark case is a statutory remedy. "In addition to actual damages, Section 1117(a) expressly provides for an award of defendant's profits, subject to the principles of equity."  Hansen Beverage Co. v. Vital Pharm., Inc., 2010 WL 3069690, at *8 (S.D. Cal. Aug. 3, 2010); see also Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1405 (9th Cir. 1993) ("The

1   Supreme Court has indicated that an accounting of profits follows as a matter of

2   course after infringement is found by a competitor.  Nonetheless, an accounting of

3   profits is not automatic and must be granted in light of equitable considerations."

4   (citations omitted)), superseded on other grounds by Pub. L. No. 106-43, § 3(b),

5   113 Stat. 219 (Aug. 5, 1999).

6        83.    The Ninth Circuit has recognized three justifications for awarding an

7   infringer's profits: (1) compensating the plaintiff for diverted sales; (2) preventing

8   unjust enrichment; and (3) serving as a deterrent to infringers.  Maier Brewing Co.

9   v. Fleischmann Distilling Corp., 390 F.2d 117, 123 (9th Cir.1968).

10       84.    To support an award of profits, a plaintiff must prove that the

11  defendant's infringement was willful.  Adray v. Adry-Mart, Inc., 76 F.3d 984, 988

12  (9th Cir. 1996) (noting that a plaintiff need not prove willfulness when lost profits

13  are merely used a proxy for estimating the plaintiff's actual damages); Lindy Pen,

14  982 F.2d at 1405; Maier, 390 F.2d at 123.  The infringement must be "willfully

15  calculated to exploit the advantage of an established mark."  Lindy Pen, 982 F.2d at

16  1405 (citation omitted).

17       85.    The Ninth Circuit has suggested that where infringement is deliberate

18  and willful, a remedy no greater than an injunction is insufficient.  See Playboy

19  Enters., Inc. v. Baccarat Clothing Co., Inc., 692 F.2d 1272, 1274 (9th Cir. 1982)

20  ("[A]n award of little more than nominal damages would encourage a counterfeiter

21  to merely switch from one infringing scheme to another as soon as the infringed

22  owner became aware of the fabrication.  Such a method of enforcement would fail

23  to serve as a convincing deterrent to the profit maximizing entrepreneur who

24  engages in trademark piracy."); see also Lindy Pen, 982 F.2d at 1405.  The Ninth

25  Circuit has also stated that making acts of deliberate trademark infringement

26  unprofitable – through the award of profits – accomplishes the purposes of the

27  Lanham Act.  Maier Brewing, 390 F.2d at 123.

28       86.    Proof of actual injury is not required to recover profits.  Gracie v.

1  Gracie, 217 F.3d 1060, 1068 (9th Cir.2000).  When awarding profits, the plaintiff

2  "is not . . . entitled to a windfall."  Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750

3  F.2d 903, 918 (Fed. Cir. 1984).

4       87.    The award of profits is justified in this case.  Provenzano deliberately

5  continued to operate the very business, using the very trademarks, trade dress, and

6  goodwill that she conveyed to Card Tech.  There can be no doubt here that

7  Provenzano did not act in a good faith belief in her right to use the marks and trade

8  dress.  Although there is little evidence of fraudulent inducement, Provenzano

9  clearly regretted her decision to sell her business and eventually decided Card Tech

10  had "stolen" it from her.  Provenzano intentionally sought to exploit the trademarks,

11  trade dress, and goodwill that she had conveyed to Card Tech, and her testimony

12  that she did not know she was acting wrongfully is false.  Further, Provenzano not

13  only deliberately infringed on Card Tech's trademarks and trade dress, but she then

14  violated the Court's preliminary injunction barring that conduct.  Under the

15  circumstances of this case, a judgment limited to an injunction is clearly

16  inadequate.

17       88.    In computing defendant's profits, the defendant has the burden of

18  proof as to the allowance of any deductions or costs from its gross sales.  15 U.S.C.

19  § 1117(a); Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S.

20  203, 206-07 (1942).  There is a presumption that an infringer's sale of infringing

21  products resulted from the infringement and not from another cause.  See

22  Mishawaka Rubber, 316 U.S. at 207 ("In the absence of his proving to the contrary,

23  it promotes honesty and comports with experience to assume that the wrongdoer

24  who makes profits from the sales of goods bearing a mark belonging to another was

25  enabled to do so because he was drawing upon the good will generated by that

26  mark.").  Where the defendant fails to establish allowable deductions, courts will

27  award gross sales.  Id. at 206-07; WMS Gaming Inc. v. WPC Prods. Ltd., 542 F.3d

28  601, 609 (7th Cir. 2008).

89.     It is Defendants' burden to prove (1) which, if any, of their sales were not attributable to the wrongful act, and (2) deductible costs and expenses to arrive at net profits.  15 U.S.C. § 1117(a); <u>Mishawaka Rubber</u>, 316 U.S. at 206-07.  In discovery, Provenzano claimed to have no records, and she did not produce any at trial.  Any doubts about the actual amount of gross sales or profits are resolved against the infringing party.  <u>See</u> <u>Louis Vuitton S.A. v. Spencer Handbags Corp.</u>, 765 F.2d 966, 972 (2d Cir. 1985) (concluding that the district court did not clearly err in finding sufficient evidence of profits where the defendants stated in a videotaped interview that they earned $3.00 to $3.50 on every $18.00 counterfeit bag they sold, and that they purchased a certain amount of counterfeit bags every week for a period of months).

90.     Provenzano did not present sufficient evidence that her nonwebsite sales were not attributable to Card Tech's goodwill in the industry.  Where there is evidence that a percentage of the infringer's sales resulted from something other than infringement, apportionment of profits may be proper.  <u>See, e.g.</u>, <u>Holiday Inns, Inc. v. Airport Holiday Corp.</u>, 493 F. Supp. 1025, 1027-28 (N.D. Tex. 1980) (awarding the plaintiff 30% of the profits made by a hotel that wrongfully used a sign bearing the plaintiff's mark where the defendant testified that 30% of the hotel's profits resulted from transient patrons reading the sign, and that 70% was "weekly trade" that resulted from the defendant's personal efforts to drum up business by knocking on doors in the community), <u>aff'd</u> 683 F.2d 931 (5th Cir. 1982); <u>but see</u> <u>Truck Equip. Serv. Co. v. Fruehauf Corp.</u>, 536 F.2d 1210, 1222 (8th Cir. 1976) (concluding in a willful infringement case that equity required awarding all profits, regardless of a market report indicating that only 20% of the defendant's profits resulted from the appearance of the infringing product or customers' knowledge of the plaintiff's mark).  Defendants presented evidence that only 10% of their sales resulted from website orders.  However, this does not show by a preponderance of the evidence that telephone orders did not result from Card

Tech's goodwill.  That a customer placed an order by phone does not mean that the customer never viewed the website.

91.     Provenzano did not present any evidence of deductible costs. Evidence of Card Tech's profit margin in 2010, or of Prodeen's profit margin in 2009 (before it was purchased by Card Tech), does not constitute evidence of Provenzano's profit margin after her employment with Card Tech terminated.  An invoice from P3 was received into evidence.  Exhibit 18.  An invoice, that presumably must be paid before the goods are received, is sufficient proof of a single deductible cost.  Tamko Roofing Prods., Inc. v. Ideal Roofing Co., 282 F.3d 23, 39 (1st Cir. 2002); Bambu Sales, Inc. v. Ozak Trading, 58 F.3d 849 (2d Cir. 1995).  However, the invoice is from 2010, and therefore is not relevant to determining Provenzano's profits from May through November 2011.

### This case is exceptional—Card Tech is entitled to attorney's fees attributable to the trademark and trade dress claims

92.     The Lanham Act permits the award of attorney's fees in exceptional cases.  15 U.S.C. § 1117(a).

93.     There is no statutory definition of an exceptional case.  The Ninth Circuit defines a case as exceptional when the non-prevailing party's case is groundless, unreasonable, vexatious or pursued in bad faith.  Gracie, 217 F.3d. at 1071 (quoting Intersteller Starship Servs., 184 F.3d at 1112).  The standard applies equally to prevailing defendants and prevailing plaintiffs.  Id.  Conclusory, unsupported statements that a party acted in bad faith are not sufficient to support the award of attorney's fees.  Id.  However, actual evidence of willful infringement has been held sufficient to support an award of attorney's fees.  Intel Corp. v. Terabyte Int'l, 6 F.3d 614, 622 (9th Cir. 1993).  The district court, as a trier of fact, may find bad faith.  Id.

94.     As stated previously, Provenzano's conduct clearly constituted willful

1   infringement.  Provenzano intentionally used the trademarks and trade dress she

2   had conveyed to Card Tech for her own benefit.  The Court finds that her testimony

3   that she did not know such use was wrongful is not credible.  Therefore, her defense

4   is groundless and unreasonable.  Furthermore, Provenzano deliberately continued

5   her infringing conduct in violation of the preliminary injunction.  The Court finds

6   that Provenzano acted in bad faith and with the intent to harm Card Tech.  This is

7   an exceptional case in which the award of attorney's fees is appropriate.

8   **Sharyn Provenzano is personally liable**

9   95.    Provenzano committed the wrongful conduct individually.  To the

10   extent wrongful conduct was committed by Prodeen Inc., Provenzano knew of,

11   authorized, directed, consented to, and actively participated in the wrongful conduct

12   of Prodeen, Inc.  Provenzano was and is the sole person through whom Prodeen,

13   Inc. operated.

14   96.    Directors or officers of a corporation incur personal liability for torts

15   of the corporation if they participate in the wrong or authorize or direct that it be

16   done.  <u>U.S. Liab. Ins. Co. v. Haidinger-Hayes, Inc.</u>, 1 Cal. 3d 586, 595 (1970).  In

17   other words, "an officer or director will not be liable for torts in which he does not

18   personally participate, of which he has no knowledge, or to which he has not

19   consented.  While the corporation itself may be liable for such acts, the individual

20   officer or director will be immune unless he authorizes, directs, or in some

21   meaningful sense actively participates in the wrongful conduct."  <u>Seagate Tech. v.</u>

22   <u>A. J. Kogyo Co.</u>, 219 Cal. App. 3d 696, 701 (1990) (alterations omitted).

23   97.    Provenzano is personally liable for the acts of Prodeen, Inc.

24   **B.    Defendant's counter-claims**

25   *Counter-claim 1*: <u>Money due on promissory note</u>

26   98.    When several documents are executed together for one transaction, the

27   documents are construed together as one instrument.  <u>Handy Boat Serv., Inc. v.</u>

28   <u>Prof'l Servs., Inc.</u>, 711 A.2d 1306, 1308 (Me. 1998); <u>Margolis v. Margolis</u>, 115

1  Cal. App. 2d 131, 136 (1952).  Thus, the promissory note must be read together

2  with the Asset Purchase Agreement.

3         99.    Card Tech has not paid all of the money due on the promissory note.

4         100.   To prevail on a breach of contract claim, the plaintiff must show (1) a

5  valid contract existed, (2) performance, or excuse of performance, by the plaintiff,

6  (3) a breach of obligations by the defendant, and (4) damages.  Jenkins, Inc. v.

7  Walsh Bros., 776 A.2d 1229, 1234-35 (Me. 2001); Wall Street Network, Ltd. v.

8  N.Y. Times Co., 164 Cal. App. 4th 1171, 1178 (2008).  To excuse performance by

9  one party to a contract, the breach by the other party must be material.  Jenkins, 776

10  A.2d at 1234; Brown v. Grimes, 192 Cal. App. 4th 265, 277 (2011).  A "material"

11  breach is the non-performance of a duty "that is so material and important as to

12  justify the injured party in regarding the whole transaction as at an end."  Jenkins,

13  776 A.2d at 1234 (finding material breach of a construction contract where the

14  contractor failed to maintain necessary working conditions at the job site);

15  Associated Builders, Inc. v. Coggins, 722 A.2d 1278, 1280-81 (Me. 1999) (finding

16  that a three-day delay in payment was not a material breach).

17        101.   Provenzano failed to perform material obligations – for example, she

18  failed to deliver all rights and domain names to presat.com, used for her own

19  purposes trademarks and business information that she had conveyed to Card Tech

20  for its exclusive use, failed to report sales, provided inaccurate information of sales

21  and shipments, and did not devote her exclusive attention to Card Tech's business.

22        102.   Card Tech is excused from further performance under the promissory

23  note.

24        103.   The Court finds for Card Tech on this claim.

25  Counter-claim 2:  Breach of contract – termination without just cause

26        104.   The Employment Agreement must be read together with the Asset

27  Purchase Agreement.  Margolis, 115 Cal. App. 2d at 136.

28        105.   California law applies to this counter-claim.  The Employment

1   Agreement's choice-of-law agreement (providing that Maine law applies) is not

2   applicable because the counter-claim is based on Provenzano's unwaivable rights

3   under the California Labor Code.  See Perry v. AT&T Mobility LLC, 2011 WL

4   4080625, at *5 (N.D. Cal. Sept. 12, 2011) (citing Gentry v. Superior Court, 42 Cal.

5   4th 443, 465 & n.8 (2007) and Armendariz v. Found. Health Psychcare Servs., Inc.,

6   24 Cal. 4th 83, 98-99 (2000), overruled on other grounds by AT&T Mobility LLC

7   v. Concepcion, 131 S. Ct. 1740, 1748-49  (2011)).

8       106.   Provenzano's employment was for a specified term under the

9   Employment Agreement.  "An employment for a specified term may be terminated

10   at any time by the employer in case of any willful breach of duty by the employee

11   in the course of his employment . . . ."  Cal. Lab. Code §2924.  To establish that its

12   termination of Provenzano was justified, Card Tech must prove that Provenzano

13   willfully breached the Employment Agreement – it is not sufficient that Card Tech

14   mistakenly believed that Provenzano breached the agreement.  Khajavi v. Feather

15   River Anesthesia Med. Grp., 84 Cal. App. 4th 32, 57 (2000) (considering an oral

16   contract for a specified term); cf. Cotran v. Rollins Hudig Hall Int'l, Inc., 17 Cal.

17   4th 93, 95 (1998) (concluding that an employer's reasonable, though mistaken,

18   belief, reached after an adequate investigation, was sufficient to justify discharge

19   where there was an implied agreement, not for a specified term, that an employee

20   not be dismissed except for good cause).

21       107.   Provenzano could only be terminated for "Just Cause" pursuant to the

22   Employment Agreement.  The Court has previously found that Provenzano

23   materially breached the Asset Purchase Agreement by failing to convey ownership

24   of the preset.com domain name.  A material breach of the Asset Purchase

25   Agreement is specified as "Just Cause" for termination in the Employment

26   Agreement, and the evidence establishes that this breach by Provenzano was

27   willful.  Card Tech need not prove any further grounds for termination.  Card Tech

28   further proved, however, that Provenzano was dishonest with Card Tech in that she,

1  *inter alia*, affirmatively misrepresented to Card Tech that the presat.com website

2  had been hacked, concealed the fact that she was ordering inventory for her own

3  sales, and concealed her true nature of her interaction with Disko. Card Tech also

4  established that Provenzano misappropriated company assets, and provided

5  inaccurate reports. These breaches constitute just cause for termination, and Card

6  Tech has established that these breaches were willful.

7      108.   Termination of the Employment Agreement excused any further

8  performance by Card Tech. <u>Brown</u>, 192 Cal. App. 4th at 277.

9  *Counter-claim 3*: <u>Failure to pay overtime</u>

10     109.   Under California wage and hour law, an employer is not required to

11 pay an employee overtime pay for overtime work on behalf of the employer if the

12 employee spends more than half of his or her time doing work that comes within

13 specified exemptions. The employer claiming the exemption bears the burden of

14 proving that the employee is exempt. <u>Kettenring v. L.A. Unified Sch. Dist.</u>, 167

15 Cal. App. 4th 507, 513 (2008).

16     110.   The applicable exemption is the Administrative Exemption: California

17 Industrial Welfare Commission Order 4-2001 ("Wage Order 4") § 1(A)(2).

18 Provenzano's work for Card Tech is subject to that exemption. Findings of Fact ¶

19 24; Wage Order 4 § 1(A)(2)(a)(i), (A)(2)(b), (A)(2)(e), and (A)(2)(f). As a result,

20 Card Tech was not required to pay Provenzano overtime.

21     111.   Card Tech was not required to provide Provenzano with *any* pay,

22 much less overtime pay, for time she spent doing her own business rather than Card

23 Tech's. Wage Order 4, § 1.

24     112.   The employee bears the burden of proving that she performed work for

25 which she was not sufficiently compensated. <u>Eicher v. Advanced Bus. Integrators,</u>

26 <u>Inc.</u>, 151 Cal. App. 4th 1363, 1377 (2007).

27     113.   Ordinarily, the employer must keep track of the amount of time a non-

28 exempt employee works. Here, there is no dispute that Provenzano worked

1  autonomously.  Indeed, this is her defense to many of Card Tech's claims.  She also

2  had autonomy to take time off as she wished.  Moreover, it is apparent that

3  Provenzano was working for herself at the same time she was working for Card

4  Tech.  Even if Card Tech had kept records, the information could only have been

5  provided by Provenzano herself because Card Tech had no ability to keep track of

6  the hours she worked.

7       114.  Provenzano did not keep any record of time she spent working for

8  Card Tech versus time she spent on her personal matters.  Provenzano never

9  asserted she was working overtime until Card Tech began raising issues about her

10  conduct.  Provenzano produced no documentary evidence that she spent more than

11  40 hours per week working for Card Tech.  The Court finds Provenzano's

12  testimony to that effect is not credible.  The Court concludes that Provenzano was

13  not working more than 40 hours per week <u>for Card Tech</u>.  Findings of Fact ¶¶ 58-

14  67.

15       115.  Thus, even if Provenzano were eligible for overtime pay, Provenzano

16  simply did not present credible evidence that she is entitled to any.

17  *Counter-claim 4*:  <u>Waiting time penalties</u>

18       116.  Under California wage and hour law, waiting time penalties are

19  awardable only if the employer *willfully* fails to pay a departing employee all wages

20  due at the time of termination.  Cal. Lab. Code § 203(a).  No waiting time penalties

21  are awardable if the employer believes in good faith that it has valid defenses to the

22  departing employee's claims for additional pay.  <u>Armenta v. Osmose, Inc.</u>, 135 Cal.

23  App. 4th 314, 325 (2005).

24       117.  Card Tech had a good faith basis to believe that no additional

25  payments were due to Provenzano at the time she was terminated because

26  Provenzano had deliberately withheld funds and therefore had dishonestly and

27  willfully caused losses to Card Tech.  <u>See </u>Wage Order 4 § 8 (providing that

28  deductions from an employee's wages are permissible where a cash shortage,

1   breakage, or loss was caused "by a dishonest or willful act, or by the gross

2   negligence of the employee").  In fact, the Court finds that Provenzano did just that.

3       118.   At trial Ms. Provenzano alluded to vacation pay.  However, she

4   acknowledged that she could take time off whenever and for whatever reason she

5   wanted.  Provenzano did not present any credible evidence that she was owed

6   vacation pay.  There is evidence that she took time off for personal matters.  Indeed,

7   the trip to Europe appears to have been, at least in part, for Provenzano's personal

8   business in violation of her duties to Card Tech.  At the very least, this would

9   qualify as vacation.

10      119.   In any event, because the Court finds no additional payments were due

11  Provenzano at the time she was terminated, Provenzano cannot prevail on this

12  claim.

13  *Counter-claim 5*:  Expenditures

14      120.   Provenzano's claim that she has incurred business expenses on behalf

15  of Card Tech, but that the company has wrongfully refused to reimburse her for

16  them, is governed by ordinary common law principles of contract law.

17      121.   There was no reason for her to retain an attorney to represent her

18  regarding a claim of patent infringement that Card Tech had already amicably

19  resolved with the claimant.

20      122.   Provenzano was told to keep expenses within reason on the trip to

21  Europe.  At least certain expenses (e.g., chauffeured limousine, hotel) were not

22  reasonable on their face.  Shortly after her return, Card Tech was suspicious of

23  Provenzano's activities in general – and rightly so.  Provenzano used the trip for her

24  personal benefit – to make a deal with Disko to be its exclusive distributor in the

25  United States.

26      123.   A plaintiff claiming reimbursement for necessary expenditures bears

27  the burden of proving recoverable expenses.  Cassady v. Morgan, Lewis & Bockius

28  LLP, 145 Cal. App. 4th 220, 239 (2006).  Provenzano has failed to carry this

1   burden.  Card Tech provided Provenzano ample opportunity to prove that the

2   expense items she now claims were in fact incurred in the course and scope of her

3   work for Card Tech and were reasonable in amount.  While a portion of the trip

4   expenses may be justified as both reasonable and for the benefit of Card Tech,

5   Provenzano has not provided such proof.  Accordingly, Card Tech has not violated

6   any obligation to reimburse her for Card Tech business expenses, and Provenzano

7   cannot prevail on this claim.

8   *Counter-claim 6*:  Alter ego

9       124.   Alter ego is not a separate claim for relief.  Leek v. Cooper, 194 Cal.

10  App. 4th 399, 418 (2011).  It is a basis for liability.  Provenzano has not proven

11  facts that establish that Card Tech was the alter ego of Norman Farrar.  In any

12  event, Provenzano has not established that she is entitled to any relief, so the claim

13  is moot.

14                              **CONCLUSION**

15      Card Tech's Claims

16  *Claim 1*: Breach of Contract

17      125.   The Court finds for Card Tech on the breach of contract claim.

18  Defendants are liable to Card Tech in the amount of $6,000.

19  *Claim 2*: Fraudulent Inducement

20      126.   The Court finds for Defendants on the fraudulent inducement claim.

21  *Claims 4 and 5*: Unfair Competition – trademark and trade dress infringement

22      127.   The Court finds for Card Tech on the trademark and trade dress

23  infringement claims.  Defendants are liable for profits in the amount of $167,022.

24  Defendants are permanently enjoined from the conduct described in the separate

25  judgment.  Card Tech is entitled to attorney's fees in an amount to be determined.

26  *Claim 6*: Unfair Competition – state law

27      128.   The Court finds for Card Tech on the state law unfair competition

28  claim.  Defendants are permanently enjoined from the conduct described in the

1    separate judgment.

2    *Claim 9*: Fraudulent Concealment

3    129.   The Court finds for Card Tech on the fraudulent concealment claim.

4    Defendants are liable to Card Tech in the amount of $20,000.

5    *Claim 11*: Conversion

6    130.   The Court finds for Card Tech on the conversion claim.  The damages

7    on this claim are the same as the damages on Card Tech's fraudulent concealment

8    claim.

9    *Claim 12*: Intentional interference with prospective economic advantage

10   131.   The Court finds for Defendants on the intentional interference with

11   prospective economic advantage claim.

12   *Claim 13*: Defamation

13   132.   The Court finds for Defendants on the defamation claim.

14   Defendants' Counter-claims

15   *Counter-claim 1*: Money due on promissory note

16   133.   The Court finds for Card Tech on this counter-claim.

17   *Counter-claim 2*: Breach of contract

18   134.   The Court finds for Card Tech on this counter-claim.

19   *Counter-claim 3*: Failure to pay overtime

20   135.   The Court finds for Card Tech on this counter-claim.

21   *Counter-claim 4*: Waiting time penalties

22   136.   The Court finds for Card Tech on this counter-claim.

23   *Counter-claim 5*: Expenditures

24   137.   The Court finds for Card Tech on this counter-claim.

25   *Counter-claim 6*: Alter ego

26

27

28

138.   The Court finds for Card Tech on this counter-claim.


                   6/7/12
Dated: _____                  *Dale S. Fischer*

                                  Dale S. Fischer
                          United States District Judge